Southwest Center for Equal Justice
Wendy F. White, AzSBN 011352
Gary Pearlmutter, AzSBN 014592
Mailing:1124 Mountainaire Rd
Flagstaff, AZ 86005
(928) 525-9255
Wendy.white@swcej.org
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Elizabeth Krakauer individually, and as guardian of Brandon Gabriel Goodwin,<br><br>          Plaintiffs<br><br>v.<br><br>City of Flagstaff, an Arizona municipality;<br>Nicholas Jacobellis, in his individual and official capacities, and Jane Doe Jacobellis, husband and wife;<br>Ryan Sherf, in his individual and official capacities, and Jane Doe Sherf, husband and wife,<br><br>          Defendants. | Case Number:<br><br><br><br>COMPLAINT<br>(42 USC 1983; ADA)<br><br>(Jury Trial Demanded) |

Elizabeth Krakauer, brings this action individually and as the guardian of Brandon Goodwin, an incompetent person, against the City of Flagstaff, and Flagstaff City police officers, Nicholas Jacobellis and Ryan Sherf, for violations of Goodwin's civil rights pursuant to 42 U.S.C. §1983, violation of his rights under the Americans With Disabilities Act and ancillary State law claims. A jury trial is demanded.

**JURISDICTION AND VENUE**

1. This action arises under 42 U.S.C. §1983, the Fourth and Fourteenth Amendments of the United States Constitution and Title II of the Americans With Disabilities Act, 42 USC §12432.   Jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343 and the aforementioned statutory and constitutional provisions. This Court has supplemental jurisdiction under 28 U.S.C. §1367 to hear claims arising under State law.

2. At all times relevant hereto, defendants Jacobellis and Sherf were acting under color of state law, and within the scope of their employment as police officers with the City of Flagstaff Police Department. Plaintiff alleges that defendants Jacobellis and Sherf violated Goodwin's rights protected by the United States Constitution and that the defendant City of Flagstaff is liable for those violations under the Monell doctrine. Plaintiff further alleges that the defendant City of Flagstaff is liable for the violation of rights granted to Goodwin under Title II of the Americans With Disabilities Act. Plaintiff also alleges that defendant City of Flagstaff is liable under the theory of respondeat superior for common law and statutory torts committed by defendants Sherf and Jacobellis.

3. Venue is proper in this judicial district under 28 U.S.C §1391 as the acts complained of arose in this district.

**PARTIES**

4. Brandon Goodwin is a severely disabled adult who was born in 1989. He has been diagnosed with schizophrenia, multiple personality disorder and is autistic. Schizophrenia and multiple personality disorders are mental health disorders under Arizona Law. Autism is a developmental disability under Arizona law. Both conditions are defined as disabilities under the Americans With Disabilities Act. He is under treatment and takes multiple prescribed medications for his conditions.

5. Goodwin is incompetent to handle his own affairs and his mother, Plaintiff Elizabeth Krakauer is his legal guardian by appointment of the Courts of the State of Colorado. Krakauer and Goodwin are residents of Colorado, currently residing in Cortez.

6. Defendant Ryan Sherf was an officer employed by the City of Flagstaff at all times relevant hereto and was acting under color of law and within the scope of his employment. Defendant Nicholas Jacobellis was employed by the City of Flagstaff as a Sergeant in the Flagstaff Police Department. Upon information and belief, both defendants are married.

7. Defendant, City of Flagstaff, is an Arizona municipality that employs police officers to conduct criminal investigations and arrests under the supervision and control of the Chief of Police. The Chief of Police, or his designee, is the final decisionmaker for matters relating to training and supervision of police officers and other employees of the Police Department.

**GENERAL ALLEGATIONS**

8. On April 27, 2019, Krakauer and Goodwin were arrested by an Arizona D.P.S. officer after being stopped for a cracked windshield while driving on I-40 near Williams, Arizona. The arresting officer confiscated all of Goodwin's medications prescribed for his mental illness, autism and anxiety disorders. Krakauer's van was towed by D.P.S. to a yard in Ashfork, Arizona. Ashfork is approximately 45 miles west of Flagstaff.

9. Krakauer and Goodwin were transported to and booked into the Coconino County Jail in Flagstaff, Arizona. Goodwin was not provided with any of his prescribed medications while in custody and decompensated quickly.

10. Goodwin and Krakauer were released after their initial appearance on April 28, 2019 at approximately 1 p.m.  Their van and all of their belongings were still in Ashfork. They had no way of retrieving it without assistance

11. The Coconino County Jail and the Flagstaff Police Department are co-located in the same building at 911 E. Sawmill Road in Flagstaff. Upon their release, they exited the jail into the joint parking lot for the building. Krakauer attempted to obtain assistance to retrieve their van by calling police. Goodwin, now completely and involuntarily unmedicated, commenced pacing in the parking lot, talking loudly to himself.  Other than his mother, no one else was in the parking lot.

12. An incoming police officer named Cade, observed Goodwin in the parking lot. He called dispatch to notify them that there was a man in the parking lot who was pacing back and forth yelling to himself.

4

13. Responding to the call, Defendant Jacobellis drove from the back of the building to the parking lot in his marked patrol unit, activating his Axon body cam on the way. He stopped directly in front of Goodwin close to the entrance. Krakauer was a few feet behind Goodwin sitting on a bench. Goodwin was standing quietly and peaceably.

14. Jacobellis stepped out of the car and asked Goodwin "Sir did you need police for some reason?" Without responding, Goodwin turned and quickly walked away turning back once to look fearfully at Jacobellis.

15.  Krakauer approached Jacobellis and, thinking that he was there in response to her call for assistance, started telling Jacobellis their predicament. Jacobellis asked, "what's he doing" and Krakauer told him "this is my son" "they had him locked up, no medication, I don't know where his medication is."

16. In explaining the situation, Krakauer told Jacobellis "he's wacked, he hasn't had medication in …. Jacobellis interrupted her and asked "what's his name?" She responded, "Brandon."  As Krakauer continued to try to get assistance from Jacobellis he responded "I'm not here for that. I'm here for someone causing an issue in the front lobby and obviously…."

17. Meanwhile Sherf pulled into the parking lot in his marked patrol unit parking directly behind Jacobellis' car.  He got out of his car and commenced watching Goodwin who was walking out of the parking lot. Jacobellis approached Sherf and explained that Brandon was "off his meds." Sherf

started laughing and said, "You think?" Krakauer was standing only a few feet away within earshot of his comments.

18. When Goodwin walked out of the parking lot he headed north on the east side sidewalk along Sawmill Road. When she saw him leave the parking lot, Krakauer started to follow him. Sherf and Jacobellis remained in the parking lot watching the two of them. Sherf continued to laugh, clap and joke about Goodwin's symptomatic behavior and appearance while watching Krakauer follow him.

19. Both Jacobellis and Sherf clearly knew at that time that Goodwin was seriously mentally ill and was involuntarily off his medication as a result of his incarceration.  At no time did either officer ask Krakauer if Goodwin had any weapons on him, if he was a danger to himself or others or if she wanted any assistance with a civil commitment. At no time did they ask for any additional information regarding the symptoms or nature of his illness. They expressed no interest in assisting her or Goodwin despite his clear confusion, fear and ongoing mental health crisis. They did not call for assistance from the Flagstaff Police Department's Crisis Intervention Team despite their proximity to the station.

20. Sawmill Road is a short two-lane city street with a speed limit of 30 miles per hour. It is wide enough to have bike lanes or shoulders on both sides. It gets little traffic. There is a sidewalk on the west side of the road that extends northbound to the end of the street. There is a sidewalk on a portion of the

east side of the road which ends approximately halfway between the police parking lot and the end of the street. A sign notices the end of the sidewalk but does not direct pedestrians to cross to the other side. The distance from the police station parking lot to the north end of Sawmill Road where it intersects with Butler Avenue is approximately one quarter of a mile.

21. Moments after Goodwin left the parking lot, police aide Zachary Eastin was driving on Sawmill in a marked police car. He saw Goodwin walking and called Jacobellis on his radio to tell him that the male who was in the parking lot earlier was standing in Sawmill road.

22. Jacobellis and Sherf immediately sped off north on Sawmill with Jacobellis in the lead. Sherf activated his Axon body cam as they pulled out of the parking lot. Sherf had a clear view of the entirety of Sawmill Road as he drove north.

23. En route to Goodwin they passed only one moving vehicle. The vehicle was unimpeded by Goodwin. The only other vehicle they passed was Eastin's patrol unit which was pulled over southbound on the west side of the road. Although Krakauer was a few hundred feet behind Goodwin and walking briskly toward him, neither officer stopped to speak with her or obtain her assistance in responding to Goodwin.

24. At no time while they drove north was Goodwin walking or standing in the roadway. At no time did any vehicle take any evasive action to avoid hitting Goodwin. At no time did any vehicles stop because of Goodwin's location. At

all times Goodwin was walking on the side of the road, entirely outside the lane of traffic. At no time was traffic obstructed by Goodwin.

25. Approximately 1,000 feet north of the parking lot, Jacobellis turned on his roof lights. He stopped his patrol car at an angle directly in front of Goodwin purposefully blocking Goodwin's way forward. He did not pull around any stopped vehicles. The only vehicle present came to a stop in response to the police lights displayed by Jacobellis, not because of Goodwin's presence. The position of Jacobellis' car forced Goodwin to walk out into the middle of Sawmill Road to walk around him.

26. Jacobellis stepped out of the car and activated his Axon body cam. He stepped in front of Goodwin with both his hands up, palms outward in the universal hand signal of the order to stop. He was wearing a full uniform, weapon, badge and other indicia of authority. He asked, "Why are you walking in the roadway?" "Is your name Brandon?" and said, "Brandon we can't walk in the roadway right now."

27. Goodwin was completely non-responsive. With each step forward by Jacobellis, Goodwin took a small step backward. Jacobellis continued toward him with his hands up, palms facing forward. Goodwin stopped stepping backward. As he stood there, he was displaying typical symptoms of autism and/or mental illness including the involuntary motion of his head in a circular pattern.

28. Goodwin was wearing only a lightweight short sleeve shirt, three quarter length light weight pants and open sandals. It was the same clothing he was wearing when Jacobellis encountered him in the parking lot minutes before. His hands were visible and not inside his pockets.

29. Without verbally responding, Goodwin took two steps towards Jacobellis and with open outstretched hands pushed Jacobellis in the chest causing Jacobellis to take two steps backwards. Goodwin again dropped his hands to his sides and stepped backward. He said nothing. He did not try to run away or leave and did nothing else threatening or menacing. In response to being pushed, Jacobellis said "Wo bro."

30. As soon as Goodwin pushed Jacobellis, Sherf rushed Goodwin from behind, grabbed him and threw him to the pavement.

31. Sherf was immediately joined by Jacobellis on top of Goodwin and both were yelling at Goodwin to relax his arms and quit resisting. Jacobellis grabbed Goodwin by his hair, violently pulling his head back then slammed his head into the pavement as hard as he could with force several times. He also punched Goodwin in the face with a closed fist two or three times.

32. As the officers were beating Goodwin in the roadway, Krakauer arrived. She told them to stop, that Brandon was mentally ill and autistic, that he wasn't on his medication. In response, Jacobellis said, "well he didn't have to attack us, we were just trying to talk to him" and told her to "back off". They continued to beat Goodwin until they got handcuffs on him.

9

33. Once they had handcuffs on Goodwin and while he was still curled up in a fetal position on the pavement, Sherf said "How's his head? This guy's definitely going to need medics now."  Sherf and Jacobellis observed that Goodwin had a number of abrasions and some blood coming from his face. An ambulance was called. Goodwin was placed in the back of Sherf's patrol unit while they waited.

34. Although Jacobellis asked Eastin to take photos of the minor abrasions on Jacobellis' knee and hand, they did not document the injuries to Goodwin.

35. The medics checked Goodwin out at the scene and were going to release him, however Krakauer insisted that he be taken to the hospital so that he could be checked out further and in order to get his medications filled. She asked that the officers not arrest Goodwin but that they take him to the Guidance Center for a mental health commitment. They refused to do so.

36. At the emergency room, Goodwin was given a very quick assessment and cleared for head trauma or serious physical injuries. He was provided with small doses of Diazapam, Depakote and Trazadone for treatment of his disorders.

37. Sherf was present to guard Goodwin during the assessment. He continued to laugh and joke about Goodwin and the incident. Krakauer overheard Sherf laughingly say to emergency room staff while in the corridor something to the effect of, "maybe we should take the mom too and get a two for one special."

38. After the assessment, Goodwin was taken back to the jail where he was again booked in. During the booking process Goodwin was further traumatized by the process of being strip searched and carried naked through the booking area.

39. Sherf prepared a probable cause statement for presentation to the court at Goodwin's initial appearance. He also prepared a report to be submitted to the County Attorney for consideration of charging. The probable cause statement and the report contain demonstrably false and misleading statements and omit critical information. He knew that the reports would be relied on by the courts and the prosecutor and that they could be submitted to a grand jury or trial jury in determining probable cause or guilt. He also knew that his report would be considered in any use of force investigation by the department.

40. Sherf relates in both documents that while driving toward Goodwin he saw him walking down the road "causing other cars to move to avoid hitting him." He states that Goodwin was in the middle of the street. He omits the fact that Jacobellis pulled in front of Goodwin completely blocking Goodwin's way which forced Goodwin to walk around his car into the street. Sherf stated that after Goodwin pushed Jacobellis Goodwin had both of his arms raised, with his fists clenched in a fighting stance. He omits from both documents that Goodwin's mother told the officers that he was mentally ill and autistic. Sherf knew these statements to be false and that Goodwin's mental illness and

autism were critical to a determination of probable cause, release conditions and charging decisions.

41. Jacobellis also prepared a report. His report includes false and misleading statements and omits critical information. He knew that the report would be relied upon by the prosecutor to determine if charges should be filed and that his statements could be presented to a grand jury or trial jury for determination of probable cause or guilt. He also knew that his report would be considered in any use of force investigation by the department.

42. Jacobellis states that he observed Goodwin walking in the middle of the road causing a traffic backup for vehicles travelling toward Butler. He stated that vehicles had to stop and that he pulled around the stopped vehicles to pull in front of Goodwin. He stated that Goodwin had his hands and his arms in his pockets. He implied that he thought Goodwin may have had a weapon. He stated that Goodwin's mother said he was disabled and autistic but omitted that she said he was mentally ill. Jacobellis knew these statements to be false and that Goodwin's mental illness and autism were critical to a determination of probable cause, release conditions and charging decisions.

43. Jacobellis formally arrested Goodwin for obstructing a highway, aggravated assault on a police officer and resisting arrest. An initial appearance was held via video court on April 29. A public defender was appointed to represent him. He was released to his mother with directions that he be taken to the Guidance Center for further evaluation. A formal Complaint was filed by the

County Attorney against Goodwin for the offenses of Obstructing a Highway, Aggravated Assault on a Police Officer and Resisting Arrest.

44. Goodwin was subsequently evaluated by a qualified psychiatrist pursuant to court order who determined that he was incompetent to stand trial and was non-restorable. Based on the evaluation the Court dismissed the criminal charges on March 5, 2020. The evaluation confirmed that Goodwin suffers from schizophrenia, autism and multiple personality disorder.

45. As a direct and proximate result of the actions and inactions of Officers Sherf, Jacobellis and the City of Flagstaff Police Department, Goodwin suffered damages including loss of liberty, extreme emotional distress and trauma, physical injury, pain and humiliation. Krakauer independently suffered extreme emotional distress upon observing the cruel, inhumane and excessive force used against her son.

**FIRST CLAIM FOR RELIEF**
**4th and 14th Amendment-Wrongful Arrest- 42 U.S.C. §1983**

46. Plaintiff incorporates the allegations contained in paragraphs 1 through 45 as if set forth in full herein.

47. The Fourth and Fourteenth Amendments of the United States Constitution protect persons from unreasonable seizure by police. An arrest is per se unreasonable if there is no probable cause to support it. A detention is unreasonable if there is no reasonable suspicion that a crime has been or is being committed and that the detainee committed it.

48. Jacobellis, while in full police uniform and in a fully marked patrol car, ordered Goodwin to stop walking, placing his hands in a position that clearly communicated that Goodwin was not free to leave. Goodwin acceded to Jacobellis' orders. The contact was not consensual and under the totality of the circumstances constituted an arrest.

49. Defendants did not have probable cause or reasonable suspicion to believe that Goodwin had committed the class 3 misdemeanor offense of Obstructing a Highway, under A.R.S.§13-2906. His detention and arrest violated Goodwin's rights under the Fourth Amendment.

## SECOND CLAIM FOR RELIEF
### 4th and 14th Amendment-Excessive Force- 42 U.S.C. §1983

50. Plaintiff incorporates the allegations contained in paragraphs 1 through 49 as if set forth in full herein.

51. The Fourth and Fourteenth Amendments of the United States Constitution protect persons from the use of excessive force when making a lawful arrest. Force is excessive if under the totality of the circumstances the force used was not objectively reasonable.

52. Under the totality of the circumstances in this case, it was not an objectively reasonable amount of force to throw Goodwin to the ground, beat his head into the pavement and punch him repeatedly in the head.

53. Sherf and Jacobellis' actions were deliberate, intentional, malicious and in conscious disregard of Goodwin's rights. Goodwin was injured both physically and emotionally as a result of the officers' use of excessive force.

**THIRD CLAIM FOR RELIEF**
**14th Amendment-42 U.S.C. §1983-Violation of Due Process**

54. Plaintiff incorporates the allegations contained in paragraphs 1 through 53 as if set forth in full herein.

55. A police officer who intentionally, knowingly or with reckless disregard for the truth makes false statements or omits material evidence in an affidavit to support an arrest or prosecution violates the Due Process rights under the 14th Amendment of a person charged with a criminal offense.

56. Sherf intentionally, maliciously or with reckless disregard for the truth made false statements and omitted critical information in his probable cause statement and his police report to justify the conduct of he and Jacobellis in beating up a severely mentally ill and autistic man, to manipulate the prosecutorial decision making process and to influence the judicial release decision.

57. Jacobellis intentionally, maliciously or with reckless disregard for the truth made false statements and omitted critical information in his police report to justify the conduct of he and Sherf in beating up a severely mentally ill and autistic man and to manipulate the prosecutorial decision making process.

58. The conduct of Sherf and Jacobellis in presenting false and misleading information in their reports and the probable cause statement violated Goodwin's right to due process and Goodwin was damaged thereby.

## FOURTH CLAIM FOR RELIEF
### Monell-Failure to Train or Supervise-42 U.S.C. §1983

59. Plaintiff incorporates the allegations contained in paragraphs 1 through 58 as if set forth in full herein.

60. The Chief of Police is aware that training on mental illness is not required by the Arizona Police Officers Standards and Training certification program and that specialized mental health training is left to the discretion of individual police departments.

61. At the time of this incident the Chief had implemented a written policy (Policy 417) regarding "dealing with individuals with mental illness and developmental disabilities" which includes a specialized training program (CIT). In addition to CIT training, the Department offered Mental Health First Aid training. The Department also has a policy (Policy 418) pertaining to civil commitments.

62. The stated goal Policy 417 is to "reduce violence, injuries and potential litigation by providing appropriate services to individuals in need of counseling, therapy or professional mental health evaluation."

63. The Chief knows that officers are likely to, and do, encounter people suffering from mental illness or developmental disabilities on an almost daily basis. He knows or should know that approximately 10% of all police calls nationally

involve persons with mental illness. The Chief knows that without sufficient training, officers encountering such persons will fail to recognize the signs and symptoms of mental illness or developmental disabilities, will misperceive conduct that is symptomatic of mental illness or developmental disabilities as criminal conduct and will be highly likely to use law enforcement techniques that exacerbate the symptoms of mental illness or developmental disabilities. The Chief knows that failure to adequately train and supervise officers will result in the excessive use of force against mentally ill or disabled persons causing injuries and even death.

64. Despite this knowledge officers employed by the Department are not required to take any specialized mental health training and only a small percentage of officers receive such training. Furthermore, the content of the training is inadequate to ensure that patrol officers understand the signs and symptoms of mental illness and developmental disabilities and can distinguish between conduct directly linked to mental illness or disability and conduct that is criminal.

65. Officers regularly fail to follow written departmental policy and the department fails to adequately supervise officers to ensure that they are complying with the written policies. The custom and practice of the department is to give officers almost complete discretion whether to follow written policies or not and failures to follow policy are routinely tolerated. In this case, Sherf and

Jacobellis did not follow the written policies of the department and no adverse disciplinary action was taken against them.

66. The failure to adequately supervise and the failure to provide adequate mandatory training to all officers shows complete and deliberate indifference to the rights of mentally ill and developmentally disabled persons and to the risk that untrained officers will engage in unconstitutional conduct when they encounter such persons such as use of excessive force, misinterpreting symptoms of mental illness or developmental disabilities as criminal activity, and discrimination against persons with mental illness and developmental disabilities.  In this case, the failure to train, failure to supervise and failure to demand adherence to policy was the moving force behind the violation of Goodwin's rights.

**FIFTH CLAIM FOR RELIEF**
**ADA 42 U.S.C. §12132 -Failure to Accommodate**

67. Plaintiff incorporates the allegations contained in paragraphs 1 through 66 as if set forth in full herein.

68. Title II of 42 U.S.C. §12132 commonly known as the Americans With Disabilities Act (ADA) prohibits state and local entities from discriminating against any qualified individual with a disability in programs, services, and activities.  This applies where police fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

69. Goodwin's disability was patently obvious to Sherf and Jacobellis before they confronted him on Sawmill Road. It was obvious from his non-criminal behavior in the parking lot that he was afraid of them and wanted to distance himself from them. Krakauer advised them that he was mentally ill, had been deprived of his medication and was, as she said, "wacked". She asked for Jacobellis' help to recover her van so that she and Goodwin could leave.

70. Instead of assisting Krakauer and Goodwin, Jacobellis and Sherf chose to escalate the situation into a full criminal investigation without calling for the Crisis Intervention Team, without considering the use of civil commitment laws, without appreciating Goodwin's fear of police, without contacting the CIT shift supervisor and without treating Goodwin as a consumer under written departmental policy.

71. Their actions were in deliberate disregard of Goodwin's to reasonable accommodations under the Americans With Disabilities Act.

72. Sherf and Jacobellis intentionally targeted Goodwin for investigation and confrontation because of his disability and thereby purposefully discriminated against him.

73. Rather than arresting Goodwin for a criminal offense, Sherf and Jacobellis could have used the authority granted them under A.R.S.§36-501 et seq and FPD Policies 417 and 418 to take Goodwin into protective custody for civil commitment as requested by both his mother and his attorney, which would have been a reasonable accommodation under the ADA.

74. The Flagstaff Police Department failed to provide adequate training and supervision regarding the signs and symptoms of mental illness and autism, communicating with those who are mentally ill or autistic, respect and empathy for persons suffering mental illness or autism, specific de-escalation techniques with persons suffering from mental illness or autism and the non-criminal option to seek civil commitment for persons suffering from mental illness.

### SIXTH CLAIM FOR RELIEF
### ADA-42 U.S.C. §12132- Wrongful Arrest

75. Plaintiff incorporates the allegations contained in paragraphs 1 through 74 as if set forth in full herein.

76. Title II of the ADA also applies where police wrongly arrest or detain someone with a disability because they misperceive the effects of that disability as criminal activity.

77. To the extent that Brandon was standing in the middle of the road as reported by Eastin, it was clear that his conduct was not criminal and that there was no reasonable suspicion or probable cause of criminal activity warranting either the detention or arrest of Goodwin. Furthermore, after wrongly detaining or arresting Goodwin for Obstructing a Highway and causing Goodwin to respond in self-defense, Sherf and Jacobellis misperceived his action in pushing Jacobellis as a criminal act rather than an act caused by his disability.

78. Jacobellis and Sherf misperceived the effects of Goodwin's disability as criminal activity both in their initial contact with him and his subsequent reaction. They therefore wrongly arrested him in violation of the ADA.

## SEVENTH CLAIM FOR RELIEF
### Assault and Battery

79. Plaintiff incorporates the allegations contained in paragraphs 1 through 78 as if set forth in full herein.

80. Sherf and Jacobellis intentionally engaged in an act that resulted in harmful or offensive contact with Goodwin by first throwing him to the ground followed by repeatedly yanking his hair, slamming his head into the pavement and punching him in the head.

## EIGHTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress-Goodwin

81. Plaintiff incorporates the allegations contained in paragraphs 1 through 80 as if set forth in full herein.

82. Sherf and Jacobellis' intentional conduct in throwing Goodwin, a mentally ill and autistic person who was involuntarily without the benefits of his medications, to the ground followed by repeatedly yanking his hair, slamming his head into the pavement and punching him in the face was extreme and outrageous and caused Goodwin to suffer extreme emotional distress.

## NINTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress-Krakauer

83. Plaintiff incorporates the allegations contained in paragraphs 1 through 82 as if set forth in full herein.

84. Krakauer was walking to catch up with her son when Jacobellis and Sherf sped by her. They knew that she was only a few hundred feet behind him and on her way to catch up with him. They knew that she was his mother and knew that Goodwin was going through a symptomatic mental health episode. They knew that she would be able to observe everything they did.

85. As she ran to intercede, she saw Sherf and Jacobellis throw her son to the ground and start pummeling him. She yelled at them to stop, that he was mentally ill and autistic. They told her to back off and sit down. She was forced to watch helplessly as Sherf and Jacobellis beat her son unable to protect him.

86. The conduct of Sherf and Jacobellis was extreme and outrageous and they intentionally or recklessly caused Krakauer to suffer extreme emotional distress.

**TENTH CLAIM FOR RELIEF**
**Violation of A.R.S. §§36-516, 36-506**

87. Plaintiff incorporates the allegations contained in paragraphs 1 through 86 as if set forth in full herein.

88. A.R.S. §36-506 specifically prohibits discrimination against persons who have been or are being treated for a mental disorder. A.R.S.§36-516 provides a

private cause of action for knowing violations of a person's rights under that chapter.

89. Goodwin is a mentally disordered person who has been treated for that disorder and is entitled to all of the protections against discrimination and cruel treatment afforded him under Arizona law.

90. Both Sherf and Jacobellis knew that Goodwin was mentally disordered and knew that he was under treatment for that disorder.

91. Both officers discriminated against Goodwin when they confronted him while he was walking peaceably on the shoulder of the roadway solely because of his patently obvious mental disorder in violation of A.R.S.§36-506.

### ELEVENTH CLAIM FOR RELIEF
### Violation of A.R.S.§36-516, §36-517

92. Plaintiff incorporates the allegations contained in paragraphs 1 through 91 as if set forth in full herein.

93. A mentally disordered person has the right to be free from harsh or cruel treatment under A.R.S §36-517.

94. Knowing that Goodwin was a mentally disordered person, Sherf and Jacobellis subjected Goodwin to harsh or cruel treatment when they slammed his head into the pavement and punched him multiple times after arresting him for conduct that was clearly caused by his mental disorder.  Their conduct violated A.R.S.§36-517.

### TWELFTH CLAIM FOR RELIEF
### Violation of A.R.S. §36-551.01

95. Plaintiff incorporates the allegations contained in paragraphs 1 through 94 as if set forth in full herein.

96. A.R.S. §36-551.01 guarantees the rights of persons with a developmental disability, which includes autism, to be free from discrimination and abuse and that such persons not be denied the rights, benefits and privileges guaranteed by the laws and constitution of the United States and the laws and constitution of Arizona as a result of said disability. Persons with developmental disabilities also have the right to be protected from abuse as a result of the disability.

97. Defendants Sherf and Jacobellis have a duty to abide by and enforce the laws of the state of Arizona including A.R.S. §36-551.01. In this case, rather than protecting Goodwin from abuse and rather than honoring his rights under federal and state constitutions and laws, defendants intentionally, knowingly, recklessly or negligently subjected Goodwin to abuse and violated Goodwin's rights guaranteed by Arizona statute.

98. Persons with developmental disabilities who believe their rights have been violated in Arizona have a private right of action by statute for redress against the violator pursuant to A.R.S.§36-551.01.

99. Goodwin is autistic and is a developmentally disabled person. Sherf and Jacobellis subjected him to discrimination and abuse because of his disability,

denied him the right to equal protection, denied him his rights under the ADA, denied him his rights under Arizona statute and the Arizona Constitution.

## DAMAGES

100. Plaintiff Goodwin has suffered damages as a direct and proximate result of the unconstitutional and tortious conduct of defendants, including emotional distress, loss of liberty, anxiety, physical discomfort and pain.

101. Plaintiff Krakauer has suffered damages as a direct and proximate result from the tortious conduct of defendants, including extreme emotional distress and anxiety.

102. Defendants' conduct in confronting Goodwin on Sawmill Road, in beating him and in deliberately including false and misleading statements in their reports was pursued with evil motive or intent or involved reckless or callous indifference to Goodwin's federally protected rights and he is entitled to punitive damages against Sherf and Jacobellis.

103. Goodwin is entitled to statutory damages pursuant to A.R.S. §36-516 in the amount of $1,000 or 3 times his actual damages against each officer for each violation of Title 36, Chapter 5.

## PRAYER FOR RELIEF

Wherefore, plaintiffs respectfully request this Court to:
A. Enter judgment in favor of plaintiffs and against defendants on all claims for relief;

B. Award plaintiff Goodwin compensatory damages against all defendants in the aggregate amount of $500,000 or such other amount as is determined at trial for claims arising under 42 USC §1983, 42 USC §12132 and common law tort claims;

C. Award plaintiff Goodwin statutory damages of $1,000 or three times his actual damages for each violation of Title 36, Chapter 5 against each of the individual defendants;

D. Award plaintiff Krakauer compensatory damages against defendants for emotional distress in an amount to be determined at trial;

E. Award plaintiff Goodwin punitive damages against Defendants Sherf and Jacobellis pursuant to 42 U.S.C. §1983 in an amount to be determined at trial;

F. Award plaintiff's counsel reasonable attorneys' fees and costs pursuant to 42 U.S.C. §1988 and any other applicable provision of the law;

G. Award plaintiffs such other and further relief as the Court may deem just and proper.

Southwest Center for Equal Justice

s/ Wendy White_____

s/ Gary Pearlmutter_____
Attorneys for Plaintiffs
