Michele Molinario, Bar #020594
Justin M. Ackerman, Bar #030726
Derek R. Graffious, Bar #033486
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1700
Fax: (602) 200-7831
mmolinario@jshfirm.com
jackerman@jshfirm.com
dgraffious@jshfirm.com

Sterling T. Solomon
Flagstaff City Attorney
Marianne E. Sullivan, Bar #021609
Senior Assistant City Attorney
211 West Aspen Avenue
Flagstaff, Arizona 86001
Telephone: (928) 213-3376
Fax: (928) 774-4087
msullivan@flagstaffaz.gov

Attorneys for Defendants City of Flagstaff,
Nicholas Jacobellis, and Ryan Sherf

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Elizabeth Krakauer individually, and as guardian of Brandon Gabriel Goodwin, <br><br> Plaintiffs, <br><br> v. <br><br> City of Flagstaff, an Arizona municipality; Nicholas Jacobellis, in his individual and official capacities, and Jane Doe Jacobellis, husband and wife; Ryan Sherf, in his individual and official capacities, and Jane Doe Sherf, husband and wife, <br><br> Defendants. | NO. 3:20-cv-08090-GMS-ESW <br><br> **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

9482757.1

Defendants, City of Flagstaff ("City"), Sergeant Nicholas Jacobellis ("Jacobellis"), and Officer Ryan Sherf ("Sherf") (collectively, "Defendants"), move this Court for summary judgment on all of Plaintiffs' claims. As addressed below, Defendants are entitled to summary judgment on all claims in Plaintiffs' First Amended Complaint.

## I.   FACTUAL BACKGROUND.

### A.   The April 28, 2019 Arrest Of Plaintiff Brandon Goodwin By FPD.

#### 1.   FPD Responded To The Parking Lot At 911 E. Sawmill Road.

On April 28, 2019, Jacobellis responded to the Flagstaff Police Department ("FPD") parking lot after hearing a disturbance call about a man, later identified as Plaintiff Brandon Goodwin. [**DSOF ¶ 1**].[1] Upon Jacobellis' arrival, he observed Goodwin in the front parking lot and exited his patrol vehicle to ask if he needed assistance. [**DSOF ¶ 5**]. Goodwin looked at Jacobellis and then turned around and walked off. [**DSOF ¶ 6**].[2] Around that same time, Sherf, who also heard radio traffic involving a suspicious person in the front parking lot, arrived on scene. [**DSOF ¶ 8**]. Almost immediately, an unknown female, later identified as Plaintiff Elizabeth Krakauer, approached Jacobellis. [**DSOF ¶ 9**]. Without any detail, Krakauer told Jacobellis that Goodwin was her son, that they were just released from jail, and Goodwin was "whacked" and off his "medication." [**DSOF ¶ 10, 11**]. Jacobellis did not know what "whacked" meant. [**DSOF ¶ 12**]. Jacobellis then radioed that the male "doesn't want to talk to police and walked off." [**DSOF ¶ 13**]. Jacobellis then conveyed to Sherf that Goodwin was "apparently off his meds," which Sherf acknowledged. [**DSOF ¶ 14-15**].

#### 2.   Police Aide Easton Observed And Reported The Same Male Obstructing Traffic In The Middle Of Sawmill Road.

---

[1] The reporting party, an off-duty police officer, informed dispatch that a man appeared to be either 10-16 (the call code for a possible mentally challenged individual) or possibly on drugs. [**DSOF ¶ 2**]. Jacobellis did not hear the reporting party's call or that the call was a possible 10-16, and instead heard parts of dispatched call over the radio and read call information on his police vehicle's monitor. [**DSOF ¶ 3**]. The log notes included no information that the call possibly involved a "10-16" situation. [**DSOF ¶ 4**]. Finally, the 10-16 code is used in situations other than mental health calls. [**DSOF ¶¶ 2 n. 1, 4**].

[2] At that time, Jacobellis was unaware if Goodwin was part of a disturbance, was the person involved, or if he was a victim of a disturbance. [**DSOF ¶ 7**].

1

Shortly after Krakauer walked off, Flagstaff Police Aide Zachary Eastin ("Eastin") observed and transmitted on the radio that Goodwin was walking northbound in the middle of Sawmill Road. [**DSOF ¶ 16**]. Eastin repeatedly observed vehicular traffic trying to avoid Goodwin, by going around him, even entering the oncoming lane. [ **DSOF ¶ 17**]. Eastin also observed Goodwin briefly cross the double center line into the southbound lane. [**DSOF ¶ 18**]. After briefly discussing Eastin's observations, Jacobellis responded to Eastin's call for assistance. [ **DSOF ¶ 19**].

### 3.    Officers Respond And Observed Goodwin Obstructing Traffic.

Sherf and Jacobellis then drove northbound on Sawmill Road headed the same direction as Goodwin toward Butler St. [**DSOF ¶ 20, 25**].[3] Butler St. is a heavily trafficked road with a higher rate of speed and more travel lanes than Sawmill. [**DSOF ¶ 25**]. Krakauer left the parking lot too, on foot, north on Sawmill. [**DSOF ¶ 22**]. As Jacobellis drove up from behind Goodwin, he observed Goodwin obstructing traffic and vehicles having to move to avoid striking him. [**DSOF ¶ 23-24, 26**]. Jacobellis then pulled around Goodwin and parked in front of him. [**DSOF ¶ 28**].[4] At this time, Goodwin went from inside the bike lane to the middle of the roadway, forcing a sedan to stop to avoid hitting him. [**DSOF ¶ 29**]. Jacobellis and Sherf then exited their vehicles and tried to talk with Goodwin. [**DSOF ¶ 31**]

### 4.    Goodwin Refused To Speak With Jacobellis Before Charging And Assaulting Him.

Jacobellis, who was in full FPD uniform, stood in front of Goodwin in the middle of Sawmill Road and observed that Goodwin was not looking at him. [**DSOF ¶ 32**]. Jacobellis approached Goodwin with his arms down and tried to get Goodwin's attention using his hands. [**DSOF ¶ 33**]. Jacobellis calmly asked Goodwin, "Is your name Brandon?" [**DSOF ¶ 34**]. Goodwin did not respond. [**DSOF ¶ 35**]. Jacobellis then informed Goodwin that "we can't walk in the roadway right now." [**DSOF ¶ 36**]. Just after this sentence, Goodwin lunged

---

[3] These calls are designated as a priority one call, the highest response call, because FPD saw an increase in pedestrian-related collisions, some leading to fatalities. [**DSOF ¶ 21**].

[4] When Jacobellis stopped Goodwin, he believed probable cause existed to arrest him for obstructing a public thoroughfare under A.R.S. § 13–2906. [**DSOF ¶ 30**]

at Jacobellis, striking and pushing him in the chest. [**DSOF ¶ 37**]. After Goodwin struck Jacobellis, both Sherf and Jacobellis observed Goodwin take a fighting stance. [**DSOF ¶ 38**]. Only 11 seconds elapsed from when Jacobellis first approached Goodwin to when Goodwin assaulted him. [**DSOF ¶ 39**]. Witnessing Goodwin's assault, Sherf approached from behind, put Goodwin in a bearhug, and used a twisting technique to take him to the ground in a controlled fall. [**DSOF ¶ 40**].[5]

### 5.   While On The Ground Goodwin Actively Resisted Arrest, Bit Jacobellis, And Continued To Try To Bite Both Officers.

Jacobellis immediately helped Sherf try to gain control over Goodwin. [**DSOF ¶ 42**]. Sherf released Goodwin from the bearhug and Goodwin's arms went directly towards the center of his chest underneath him. [**DSOF ¶ 43**]. Jacobellis reached down to try to gain control of Goodwin's wrist and he felt Goodwin bite his forearm. [**DSOF ¶ 44**]. Jacobellis exclaimed, "Don't Bite me! Ah, god dammit!" [**DSOF ¶ 45**]. As Both Sherf and Jacobellis continued trying to place Goodwin in handcuffs while he was on the ground, Jacobellis felt Goodwin tuck himself further down and hunch over, causing Jacobellis to lose his balance and fall onto his right knee. [**DSOF ¶ 46**]. Goodwin then continued to struggle and resist arrest. [**DSOF ¶ 47**].[6]

About 15 seconds after Jacobellis first called out that Goodwin had bit him, Jacobellis again called out that Goodwin was trying to bite him. [**DSOF ¶ 49**]. Jacobellis told Eastin to request back up officers to help them arrest Goodwin, which Eastin did. [**DSOF ¶ 50**]. Shortly after, Police Aide Eastin then informed Jacobellis and Sherf that Goodwin "is stiffing up." [**DSOF ¶ 51**]. Almost simultaneously, Jacobellis observed Goodwin's head again coming back towards his forearm and believed Goodwin was going to bite him. [**DSOF ¶ 52**]. To avoid being bitten again, Jacobellis had a loose hold of Goodwin's hair at that moment, and

---

[5] Contrary to the allegations in Plaintiffs' First Amended Complaint, *see* Doc 13 ¶ 88-89, Krakauer was not yet near the area and did not observe Goodwin assault Jacobellis or Sherf grab and take Goodwin to the ground. [**DSOF ¶ 41**].

[6] By this time, Eastin also involved himself in the altercation by holding onto Goodwin's legs so his kicking would not strike Jacobellis. [**DSOF ¶ 48**].

began to strike Goodwin's head on the pavement two to three times. [**DSOF ¶ 53**]. While doing this, Jacobellis lost control of Goodwin's wrist and he felt Goodwin wrap his arm around the back of Jacobellis' right leg. [**DSOF ¶ 54**].[7] During this time the officers gave multiple commands for Goodwin to give up his hands so that they could place him in handcuffs, but he did not comply. [**DSOF ¶ 58**]. In fact, Goodwin was still resisting at that time and Jacobellis observed Goodwin's face coming back up in what he believed was another attempt to bite him. [**DSOF ¶ 59**]. Because of the lack of control of Goodwin's arms, the close proximity to Jacobellis' secondary weapon, and Goodwin's apparent attempt to bite Jacobellis again, Jacobellis then used his fist to strike Goodwin on the head two to three times. [**DSOF ¶ 60**].

At no point before the head strikes was Goodwin compliant or did his body go limp. [**DSOF ¶ 61**]. These strikes also successfully stunned Goodwin and allowed Jacobellis to regain control of Goodwin's wrist so that he would be handcuffed. [**DSOF ¶ 62**]. Goodwin actively resisted so aggressively that it took officers over a full minute to get Goodwin handcuffed following Sherf taking him to the ground. [**DSOF ¶ 63**]. The officers were both surprised by Goodwin's strength. [**DSOF ¶ 64**]. No other force was used after Goodwin was handcuffed. [**DSOF ¶ 65**].

### 6.    Plaintiff Krakauer Arrived On Scene Just As The Fight Was Ending And Officers Handcuffed Goodwin.

No evidence exists that any of the officers knew that Krakauer was on scene when force was used. [*See* **DSOF ¶ 71**]. It is undisputed that Krakauer was not on scene and did not see: (1) Jacobellis talk to Goodwin, (2) Goodwin assault Jacobellis, (3) Sherf bear hug and bring Goodwin to the ground, (4) Goodwin bite, and continue to attempt to bite, the officers, or (5) Jacobellis impact Goodwin's head on the pavement. [**DSOF ¶ 66**]. Krakauer

---

[7] While unlikely known to Goodwin at that moment, Jacobellis carried a secondary firearm on his left ankle and was close to where Goodwin was grabbing. [**DSOF ¶ 55**]. While Jacobellis does not contend that Goodwin was grabbing for or deliberately seeking to disarm him of his secondary weapon [**DSOF ¶ 56**], he was concerned for his safety, given Goodwin's hands close proximity to his secondary weapon and the fact that Goodwin was still resisting and was not yet handcuffed. [**DSOF ¶ 57**].

testified that she arrived on scene at the 1:21 second mark on Sherf's body-camera recording, but had no idea what Goodwin was doing. [**DSOF ¶ 67**]. Krakauer also arrived from behind the officers and once she did, she yelled at Goodwin to "chill out" because she knew that if he resisted arrest he could get hurt. [**DSOF ¶ 68**]. Krakauer testified that the only force she observed was Goodwin being hit in the head. [**DSOF ¶ 69**]. Krakauer then made her way in front of the officers at the 1:27 mark in Sherf's body-camera recording. [**DSOF ¶ 70**]. Krakauer informed the officers for the first time that Goodwin was allegedly autistic and mentally ill, to which the officers respond, "well he did not have to assault us." [**DSOF ¶ 72**]. As the officers handcuffed Goodwin, Krakauer exclaimed, "you guys did this, not you, them," referring to the Department of Public Safety ("DPS") and County Jail staff. [**DSOF ¶ 73**]. Krakauer then continued talking about Goodwin's lack of medication because of their prior detainment in jail. [**DSOF ¶ 74**].

### B.   Goodwin Was Medically Examined.

As Sherf and Eastin continued to hold Goodwin on the ground, Jacobellis inquired about any injury to Goodwin's head; Sherf replied that medics were needed. [**DSOF ¶ 75**]. Jacobellis then radioed for medics to respond. [**DSOF ¶ 76**]. Following the arrest, Krakauer thanked the officers for getting Goodwin and confirmed that Goodwin had "ran down the road crazy." [**DSOF ¶¶ 77-79**]. Eastin then photographed Jacobellis's and Sherf's injuries. [**DSOF ¶ 80**]. Eastin observed Sherf's wrist was swollen and observed red marks on Jacobellis's arm consistent with being bitten by Goodwin. [**DSOF ¶ 81**].

Shortly thereafter, emergency responders arrived on scene to evaluate Goodwin, who had some minor injuries. [**DSOF ¶ 82**]. Jacobellis also informed the paramedics that he had struck Goodwin's head a few times. [**DSOF ¶ 83**]. After the responder's examined Goodwin, they medically cleared him to be taken to jail, but Krakauer requested that he be transported to the hospital for further evaluation and to receive his proper medications. [**DSOF ¶ 84**]. Goodwin was then medically evaluated at the Flagstaff Medical Center ("FMC"). [**DSOF ¶ 85**]. FMC emergency room physician Dr. Lotz's medical records state that there was no concern of any head injury. [**DSOF ¶¶ 86-87**]. Dr. Lotz reported: "Head, no, scalp abrasions,

5

hematomas, or lacerations noted, no evidence of trauma." [**DSOF ¶ 88**]. Goodwin was also never otherwise treated for any head injury following the date of the subject incident. [**DSOF ¶ 89**]. Goodwin was then discharged and taken to jail. [**DSOF ¶ 90**].

### C. Coconino County Attorney's Office Prosecuted Goodwin.

Jacobellis and Sherf were designated victims of Goodwin's aggravated assault. [**DSOF ¶ 91**]. FPD Detective Casey Rucker ("Rucker") was the assigned investigator who reviewed the police reports, and ultimately submitted the charges against Goodwin to the Coconino County Attorney's Office ("CCAO"). [**DSOF ¶ 92**]. Other than one email advising Jacobellis and Sherf that he was seeking charges, Rucker had no other communications with them. [**DSOF ¶ 93**]. As part of the submittal to CCAO, Rucker sent a charging request form that detailed the parties involved and the proposed charges as well as providing all reports, digital media, and body cam footage. [**DSOF ¶¶ 94, 96**]. This is done so that the prosecutor can independently review the case and determine whether to bring charges. [**DSOF ¶ 95**]. Following Rucker's submittal, CCAO prepared the criminal complaint against Goodwin for Rucker's signature. [**DSOF ¶ 97**].

Deputy Coconino County Attorney Paul Rubin ("Rubin") then brought three charges against Goodwin: (1) Aggravated Assault, (2) Resisting Arrest, and (3) Obstructing Public Thoroughfare. [**DSOF ¶ 98**]. Other than obtaining jail surveillance video, the county attorney did not request Rucker to do any additional investigative follow up. [**DSOF ¶ 99**]. During the prosecution, Goodwin's public defender requested that DCA Rubin dismiss the charges against Goodwin because of his alleged mental health issues. [**DSOF ¶ 102**]. The public defender also sent correspondence to DCA Rubin outlining what she believed to be untrue statements in the reports and issues with the officers' actions during the subject incident. [**DSOF ¶ 103**].

Ultimately, in March 2020, the criminal court granted the State's Motion to Dismiss Without Prejudice Pursuant to Rule 11 mental health issues. [**DSOF ¶ 104**].[8]

---

[8] During the prosecution, Rubin emailed Jacobellis and Sherf to request their opinion as to the potential dismissal of the charges against Goodwin because of mental health issues.

6

9482757.1

### D.   FPD's Policy, Training, and Supervision

#### 1.   FPD Policy And Training Involving Mental Health Encounters

FPD provides trainings for its officers above and beyond AZPOST[9] requirements on police officer interactions with individuals who may be experiencing mental health issues. [**DSOF ¶ 105**]. The only mandatory training for mental health that law enforcement officers in Arizona must attend is determined by AZPOST and occurs in the police academy. [**DSOF ¶ 106**]. Above that requirement, FPD implemented, more than 14 years ago, a Crisis Intervention Team ("CIT") Program, which requires completion of a 40-Hour CIT Training Course.[10] [**DSOF ¶ 107-108**]. The 40-Hour CIT Training includes training on Serious Mental Illness Overview, Autism Spectrum Disorders, Understanding Developmental Disabilities, and Police Crisis Intervention. [**DSOF ¶ 110**]. On top of the 40-Hour CIT Training Course, FPD provides several additional trainings relating to police officer interactions with individuals who may have mental health issues and developmental disabilities. [**DSOF ¶ 112**].[11] CIT International also recommends law enforcement agencies have 20% of its officers CIT certified, and FPD has met or exceeded that recommended amount. [**DSOF ¶ 111**].

Here, both Jacobellis and Sherf are AZPOST certified. [**DSOF ¶ 113**]. Sherf was also a CIT trained officer before the incident. [**DSOF ¶ 114**]. Additionally, both Jacobellis and Sherf completed the FPD's eight-hour Mental Health-First Aid training and De-escalation training before the incident. [**DSOF ¶ 115**]. Jacobellis has also taken additional trainings relating to police officer interactions with individuals who may be having a mental health issue. [**DSOF ¶ 116**]. It is further undisputed that Jacobellis and Sherf's training on mental

---

[**DSOF ¶ 100**]. Jacobellis understood this contact to be in his capacity as a victim. [**DSOF ¶ 101**].

[9] AZPOST is the Arizona Peace Officers Standards and Training Board, which establishes reasonable minimum qualifications for officers to be appointed to enforce the laws of this state and training standards. A.R.S. § 41-1822 (A)(3)(4).

[10] Interestingly, Plaintiffs' counsel, Wendy White, was not only involved in the creation of the CIT program, but was an instructor during the 2007 CIT Training Course. [**DSOF ¶ 109**].

[11] The record is undisputed, based on the opinions of Police Practices Expert, Dr. Blake McClelland, that the City's trainings for mental illness exceed the standards set by AZPOST. [**DSOF ¶ 117**].

illness was above and beyond the mental illness training that they received in their police academy curriculum as required to be AZPOST certified. [**DSOF ¶ 118**].

### 2. FPD Policy And Training On Use Of Force.

FPD also maintained policies governing use of force and officer interactions with individuals who may be experiencing a mental health issue. [**DSOF ¶ 119, 122-124**]. The FPD regularly trains its officers on these policies, including Jacobellis and Sherf. [**DSOF ¶¶ 120-121**]. FPD also has specific policies on the use of force in response to resistance of an individual. [**DSOF ¶ 125**]. As relevant here, FPD policy authorizes head strikes, under the definition of "intermediate force," when faced with an individual displaying active aggression. [**DSOF ¶ 126-127**]. Moreover, nothing within FPD's policies or training require police officers to abstain from arresting a person with a mental illness when probable cause exists or to abstain from using reasonable force when attacked by individuals with mental illness. [**DSOF ¶ 128**]. Finally, FPD officers receive training on this policy more than once annually through different trainings. [**DSOF ¶ 129**].

### 3. Jacobellis And Sherf Were Never Previously Disciplined For Excessive Force And/Or Wrongful Arrest And FPD Was Not On Notice Of Any Unconstitutional Custom Or Practice.

Before the incident, Jacobellis and Sherf had never received discipline for any alleged excessive use of force or wrongful arrest. [**DSOF ¶ 130**]. Moreover, no prior incidents put FPD on notice that there were any deficiencies in its policies or training. [**DSOF ¶¶ 131-132**]. To attempt to show that FPD was on notice of purported deficiencies, Plaintiffs raise four previous use of force incidents that purportedly put FPD on notice that there were deficiencies in training and/or policy. [**DSOF ¶ 131**]. But each of the three incidents for which FPD was involved was not only properly investigated but resulted in no finding of any policy violation or wrongdoing, and each was reviewed by Defendants' police practices expert, Dr. McClelland, who confirmed that none of these prior incidents violated any policies and the uses of force were proper. [**DSOF ¶¶ 132-136**].

FPD also investigates its officers' conduct when complaints and internal affairs investigations are received. [**DSOF ¶ 137**]. When an allegation of wrongdoing is sustained,

8

officers will receive some form of discipline, reprimand, remedial training, and/or suspension and termination when appropriate. [**DSOF ¶ 138**]. Additionally, there have been times that the Chief of Police may disagree with command staff's recommended discipline or findings of no policy violation and sustain a complaint. [**DSOF ¶ 139**]. FPD command staff has also requested additional investigation in certain use of force incidents occur to decide whether the force was justified. [**DSOF ¶ 140**].

> ### E.   Consistent With FPD Policy And Procedure, This Incident Was Reviewed And The Officers' Respective Uses Of Force Was Found Justified.

After this incident, Jacobellis and Sherf submitted a required use of force report form, which was investigated by FPD command staff, and found to be justified. [**DSOF ¶ 141**].

## II.   PLAINTIFFS' § 1983 WRONGFUL ARREST CLAIM FAILS (COUNT 1).[12]

Plaintiffs concede that the officers had probable cause to arrest Goodwin after he assaulted Jacobellis. [DSOF ¶ 149]. Rather, Plaintiff's entire wrongful arrest claim is based on the brief 11-second *Terry* stop. [*Id.*]. The initial stop was justified based on Eastin's, Jacobelllis' and/or Sherf's observations of Goodwin obstructing traffic, and the community caretaking doctrine.

> ### A.   The Officers Had Reasonable Suspicion to *Terry* Stop Goodwin, Which Quickly Developed into Probable Cause to Arrest Him.

A peace officer may stop and detain a person as is reasonably necessary to investigate an actual or suspected violation of any traffic law committed in the officer's presence. *See Terry v. Ohio*, 392 U.S. 1 (1968); A.R.S. § 13–3883. The Fourth Amendment permits brief investigatory stops by police if the officer's actions are supported by reasonable suspicion that criminal activity is afoot. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). To establish reasonable suspicion, the officer must be able to articulate a particularized and objective basis for his or her suspicion that the person is, or recently was, engaged in criminal

---

[12] Plaintiffs' Complaint appears to plead a Fourteenth Amendment wrongful arrest claim. However, the Fourth Amendment governs a wrongful arrest. *Hamre v. City of Bothell*, 81 F. App'x 260, 262 (9th Cir. 2003) (citing *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002)). Thus, any such claim under the Fourteenth Amendment fails. *See id.*

9

activity. *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014).[13] Moreover, "suspicion to stop for investigatory detention may ripen into probable cause to arrest through the occurrence of facts or incidents after the stop." *United States v. Medina-Gasca*, 739 F.2d 1451, 1453 (9th Cir. 1984); *United States v. Greene*, 783 F.2d 1364, 1368 (9th Cir. 1986). Importantly, probable cause to arrest is an absolute bar to any § 1983 wrongful arrest claim. *Lacy v. Maricopa Cty.*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008).

Setting aside Eastin's observations, which gave reasonable suspicion to detain and/or probable cause to arrest Goodwin, Defendants' personal observations of Goodwin obstructing traffic provided articulable reasonable suspicion and probable cause that Plaintiff violated Arizona law for obstructing a highway under A.R.S. §§ 13–2906(A)(1). *See also* A.R.S. § 13-3883 (providing a "peace officer, without a warrant, may arrest a person if the officer has probable cause to believe… A misdemeanor has been committed in the officer's presence and probable cause to believe the person to be arrested has committed the offense."). As a result, the Defendant officers could temporarily stop and detain Plaintiff under *Terry* without violating his Fourth Amendment Rights.

**B.** **The Officers Were Also Entitled To Stop And Temporarily Detain Goodwin Due To Community Caretaking Duties.**

Although Defendants had reasonable suspicion and/or probable cause to stop and speak with Goodwin when he obstructed traffic on Saw Mill Rd., Defendants were also entitled to stop Plaintiff under the Community Caretaking doctrine. The Supreme Court recognized this exception to Fourth Amendment protections in emergency situations "to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 534 (9th Cir. 2010); *United States v. King*, 900 F.2d 1552, 1560 (10th Cir. 1993) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). Under this exception, a police officer may seize a person "in order to

---

[13] Proof of wrongdoing is not required, and a level of suspicion is less than probable cause necessary to arrest. The officer is allowed to "draw on [his or her] own experience and specialized training to make inferences from and deductions about the cumulative information available . . . that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." *Id.* at 1560; *Moline v. City of Castle Rock*, 255 F. App'x 120, 121 (9th Cir. 2007); *Bently v. City of Mesa*, 2020 WL 1888978 *4 (D. Ariz. Apr. 16, 2020). Like a *Terry* stop, a community caretaking stop requires a reasonable belief that the person poses a danger to himself or the public. *Shields v. Tracy*, 2005 WL 1490300, at *4 (Jun. 21, 2005).

Here, Jacobellis was aware of past pedestrian-related fatalities and FPD's high prioritization of these calls. The Officers reasonably believed that Goodwin posed a danger to himself or the public when he was walking northbound on Sawmill Rd. jeopardizing the safety of himself as well as the motorists driving on Sawmill Rd. Additionally, Plaintiff was approaching a busy intersection at Sawmill and Butler. Indeed, if Krakauer's statements about Goodwin being "whacked" and "off his meds" were heard and understood by the officers, contacting and stopping Goodwin before he could hurt himself or others was reasonable and consistent with the officers' community caretaking function. *See e.g.*, *Tinius v. Carroll Cty. Sheriff Dep't.*, 321 F. Supp. 2d 1064, 1075 (N.D. Iowa 2004); *Adams*, 254 F.3d at 764. Finally, the length of the Community-Caretaking stop was only a matter of seconds before Plaintiff assaulted Jacobellis and the incident was elevated to an arrest.

**C.   Goodwin's Alleged Mental Health Issues Do Not Negate Any Probable Cause For His Arrest.**

Plaintiff's alleged mental health issues also cannot negate the fact that probable cause and/or reasonable suspicion existed to stop and arrest Plaintiff. In *O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021), the Ninth Circuit recently addressed a § 1983 wrongful arrest claim in which the plaintiff argued that his lack of mens rea nullified the probable cause to arrest him. The Ninth Circuit recognized that "[w]hile [plaintiff's] alleged lack of mens rea by reason of his seizure could be a defense to criminal liability, "[i]t is not the rule that police must investigate a defendant's legal defenses prior to making an arrest." *Id.* at 1040 (quotations and alterations omitted). The Court further went on to hold that the officers had no duty when making a stop or arrest to assess a suspect's mental capacity to form a mens rea to commit a crime. *Id.* at 1041. Nor did the Court believe that subsequent medical determinations

9482757.1

following the arrest for facially unlawful conduct remove probable cause. *Id.* at 1040-43. Thus, the Court held that "no clearly established law required the officers to credit O'Fria and O'Doan's explanation and deem true a possible defense, namely, that O'Doan lacked the wherewithal to be responsible for unlawful conduct." *Id.* at 1043.

## III. **GOODWIN'S § 1983 EXCESSIVE FORCE CLAIMS FAIL (COUNT 2).**[14]

Jacobellis and Sherf used only reasonable and necessary force under the totality of the circumstances. Fourth Amendment claims of excessive are analyzed under an objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). To determine whether a Fourth Amendment violation has occurred, a court must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 396–97 (1989)). The Ninth Circuit has set forth a three-step test to determine objective reasonableness:

> First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion. Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances.

*Id.* (internal citations and quotations omitted). Here, under the above analysis, the officers' respective uses of force were objectively reasonable.

---

[14] Plaintiffs' First Amended Complaint appears to plead a Fourteenth Amendment excessive force claim. [*See* Doc. 35 at 8]. But the only cognizable claim for an intentional use of excessive force by law enforcement is under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *see also Lane v. City of Mesa*, No. CV-10-00852-PHX-SMB (D. Ariz. Dec. 10, 2019). Thus, Plaintiffs' alleged Fourteenth Amendment excessive force claim must be dismissed with prejudice.

### A.     Sherf's Take Down Maneuver Was Objectively Reasonable.

A take down maneuver is a moderate deployment of force and is routinely found appropriate where a suspect is refusing lawful commands and is threatening the officer or community at large. *See e.g.*, *O'Doan*, 991 F.3d 1027; *Silva v. City and Cty. Of Honolulu*, 2021 WL 1041713, at * 1-2 (9th Cir. Mar. 18, 2021).

In *O'Doan,* officers encountered an individual engaged in unlawful conduct who failed to follow lawful commands and made threatening gestures. 991 F.3d at 1037. One officer then executed a reverse reap throw on the individual, bringing him to the ground. *Id.* The Court determined that this moderate use of force was justified because it was "not clear that other less intrusive alternatives would have sufficed to bring O'Doan under control, especially when O'Doan had refused to heed several warnings to stop." *Id.* (citing *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017)).[15]

In another case with similar facts, the Ninth Circuit held in *Silva* that an officer's use of much more substantial force than a takedown was justified. 2021 WL 1041713, at * 1-2. In *Silva* the decedent was walking in the street, refused to leave, physically charged one officer, and took a fighting stance toward another. *Id.* The officers employed pepper spray after verbal warnings were ineffective in controlling the decedent and then only employed the Taser when the decedent did not respond to the pepper spray. *Id.* The Court held the officers should not have acted differently by blocking traffic on the street, and stated that just because the officers could have acted differently "did not mean that the Officers were not permitted to act based on the risks the perceived, including risks posed by traffic on a busy street, when Mr. Haleck was walking in and refused to leave the street." *Id.* The Court further held that

---

[15] The Court also discussed other cases granting qualified immunity on excessive force claims in which more significant uses of force in less challenging situations occurred. *See, e.g.*, *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1113, 1117–18 (9th Cir. 2017) (officer did not violate clearly established law when student "refuse[d] to comply with the officer's orders" to drop water balloons and the officer "progressively increase[d] his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver," sending student "face first onto the pavement"); *Ames v. King Cty.*, 846 F.3d 340, 344-45 (9th Cir. 2017) (use of force not excessive when officer, responding to mother's call about her son's suicide attempt, "employed a hair hold to distract" the mother and then "slammed [her] head into the ground three times"); *see also, e.g.*, *Felarca v. Birgeneau*, 891 F.3d 809, 816 (9th Cir. 2018).

even if the dangers of traffic were disregarded, the physical charge and fighting stance supported the officers' use of intermediate, non-deadly force.

Like the officers in *O'Doan* and *Silva*, Defendants faced Goodwin in the middle of the street, who did not move out of the roadway, physically charged and assaulted Jacobellis, and then assumed a fight stance in Jacobellis' direction. Because of his close proximity, Sherf, who had arrived behind Goodwin, ran up and took Goodwin to the ground. This minimal use of force after observing Goodwin assault Jacobellis, just like the officers in *O'Doan* and *Silva*, was reasonable under the circumstances to gain control over him, attempt to stop any further assault or violent act by Goodwin against Jacobellis, and take Goodwin into custody before he caused any further harm to himself or the community at large.

**B.**    **Jacobellis' Head Strikes Were Objectively Reasonable.**

**1.**    **The Head Strikes Were, In Actuality, Minimal Uses of Force.**[16]

Before assessing the reasonableness of Jacobellis' head strikes against Plaintiff, it is important to define what degree of force it was given the actual evidence in this case. As a threshold issue, head strikes with a fist are generally considered intermediate, not deadly, force.[17] *Steinmeier v. Cty. of San Diego*, 2020 WL 377052, at *6 (S.D. Cal. Jan. 23, 2020) ("punching, kicking, and/or hitting with a flashlight are intermediate levels of force that significantly intrude on Fourth Amendment rights."); *Moore v. City of Boise*, 2018 WL 1474060, at *16 (D. Idaho Mar. 26, 2018), aff'd, 829 Fed. Appx. 810 (9th Cir. 2020) (accepting Plaintiff's contention that officer's actions caused him serious pain, but refusing to conclude that the hits, head-strikes, and taking Plaintiff to the ground were egregious uses of force); *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016) ("Generally, impact blows by punching or kicking are considered 'significant force.'") (citation omitted); *Sheridan v.*

---

[16] Defendants incorporate by reference their related Daubert Motion on Plaintiffs' expert, Timothy Williams, who improperly contends that the use of force at issue is deadly force. Such an opinion, as stated below and in Defendants' Daubert motion is improper for an expert to make nor is it supported by any existing Ninth Circuit or Supreme Court authority.

[17] Plaintiffs' disclosure statements and expert report improperly assert Jacobellis' head strikes were deadly force.

1    *Trickey*, 2010 WL 5812678, at *5 (D. Or. Dec. 16, 2010), report and recommendation

2    adopted, 2011 WL 588769 (D. Or. Feb. 10, 2011) (holding an officer slamming a suspect's

3    head against the asphalt with sufficient force to knock him unconscious and to fracture his

4    face was not deadly force, but intermediate level force).[18]

5         This Court must also "consider the severity of injuries in evaluating the amount of

6    force used." *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002), and where only minor injuries

7    exist, as in this case, the Court "may infer . . . that the force applied was minimal." *Felarca v.*

8    *Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (citing *Jackson v. City of Bremerton*, 268 F.3d 646,

9    652 (9th Cir. 2001)). Here, Plaintiff's medical records show Goodwin did not suffer any head

10   injury as a result of Jacobellis' use of force. Indeed, that Goodwin was examined on scene

11   and cleared by medical providers, was examined by hospital staff and was treated only for

12   minor abrasions (not head injuries), and never later sought any treatment for any purported

13   head injuries proves that the amount of forced used was minimal.[19] *See Steinmeier*, 2020 WL

14   377052, at *6 ("The lack of injury therefore provides some support that the Deputies' strikes,

15   in and of themselves, were not excessively forceful."). As a result, the amount of force at

16   issue by Jacobellis falls well below the threshold of deadly force, and give the utter lack of any

17   evidence about any significant head trauma [never mind the lack of *any* head injury], should

18   be determined to be a minimal use of force.

19            **2.      Jacobellis' Head Strikes Were Objectively Reasonable.**

20        Following Goodwin being taken to the ground he struggled with the officers for

21   roughly over a full minute before he was handcuffed. During the first 36 seconds of that

22   struggle, Goodwin can be seen resisting officer control and their repeated commands to give

23   up his hand so he could be handcuffed as well as trying to bite the officers repeatedly. In so

24
---

25   [18] Open hand strikes are also different than strikes to the head with a weapon, such as a
     baton. *Compare Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011) (noting the

26   standard issue baton "is a deadly weapon that can cause deep bruising as well as blood
     clots capable of precipitating deadly strokes," and, "batons should therefore be used only as a
     response to aggressive or combative acts.") *with Blankenhorn v. City of Orange*, 485 F.3d 463,

27   477 (9th Cir. 2007) (Generally, impact blows by punching or kicking are considered
     "significant force.").

28   [19] The COF policies also clearly state head strikes are intermediate force. [**DSOF ¶ 127**].

                                                15

doing, Goodwin not only actively and aggressively resisted arrest but also bit, and continuously tried to bite both Sherf and Jacobellis in violation of Arizona law. *See* A.R.S. §§ 13-2508(A), (B), 13-1204(A)(8)(a). It bears repeating that the Court can hear, in real time, Officer Jacobellis stating, "don't bite me" and "he's trying to bite me" as the fight occurred. Goodwin can also even be seen moving his face upwards and officers calling out that he was stiffing up just before Jacobellis struck Goodwin's head. Photographs depict marks consistent with a bite. It was only after lawful commands failed and after Brandon had bitten and tried to bite Jacobellis for a second time that he grabbed the end of Goodwin's hair and used it to strike Goodwin's head to gain his compliance. Following these strikes, the officers were finally able to handcuff Goodwin. No force was used after Goodwin was handcuffed.

Under the totality of these circumstances, Jacobellis' use of force was objectively reasonable. *See Black v. Simmons*, CIV-19-101-KEW, 2020 WL 5834789, at *7 (E.D. Okla. Sept. 30, 2020) (10th Cir. Mar. 11, 2021) ("Plaintiff's contention that Officer Simmons began shouting 'don't bite me' to justify punching Plaintiff in the face is nothing more than conjecture and speculation. It is clear from the officer body camera videos that Officer Simmons believed Plaintiff was biting him. Based on the totality of the circumstances, including that Plaintiff continued to resist arrest and the officers continued to struggle to handcuff Plaintiff, Officer Simmons' response [punching him in the face] was objectively reasonable.") (citation omitted); *id.* (finding another officer's use of strikes on the same suspect's face with a flashlight reasonable under the totality of the circumstances).

**C.**     <u>**Plaintiff Was Aggressively Resisting Arrest And Attempting To Escape Prior To The Bear Hug And After He Was Taken To The Ground.**</u>

As noted above, Plaintiff violently assaulted the officers, bit them, refused lawful commands and actively resisted arrest to escape their custody and control. Thus, this factor favors the officers' respective uses of force.

**D.**     <u>**The Officers Had No Actual Knowledge Of Plaintiff's Mental Issues Prior To Their Respective Uses Of Force But Even If They It Has No Impact On Their Use Of Force.**</u>

Even if Goodwin argues that the officers' uses of force were unconstitutional as a

16

result of his alleged mental illness, such a factor should only be considered where the officers had a reasonable opportunity to learn of such facts before their use of force. *See Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (noting officers had mere seconds to assess dangerousness of suspect after arriving on scene for roughly a minute and did not have a chance to discover the suspect's mental issues); *Glenn v. Washington Cty.*, 673 F.3d 864, 875 (9th Cir. 2011). Here, once the officers encountered Goodwin in the roadway they had mere seconds to attempt to speak with him to leave the roadway before he immediately became aggressive and combative. There was no time in the rapidly evolving and violent minute and a half long fight for the officers to assess whether Goodwin was suffering from a mental disorder until after the officers had used force to control him and placed him in handcuffs.

But even if the officers were aware Goodwin suffered from a mental disorder, it would not have changed how they would have reacted to Goodwin's active aggression in a busy roadway. More importantly, while consideration of known mental illness is a factor under *Graham,* an officer need not abstain from using force in self-defense simply because an aggressor suffers from mental illness. *Derole v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals."); *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) (recognizing same). Moreover, unlike other scenarios, the officers needed to remove Goodwin from the active roadway as he approached a busy intersection. The officers did not have time to consider and pursue less intrusive alternatives, particularly given that Goodwin was nonresponsive and immediately became aggressive. As a result, the Court should not consider this as a factor cutting against the officer's respective uses of force.

**E.      On Balance, The Officer's Use of Force Was Objectively Reasonable.**

This incident involved rapidly escalating violent behavior from Goodwin. It began with him staggering through a road approaching a busy intersection, to a violent shove against an officer, to biting the officers while resisting arrest after being taken to the ground. Both Sherf and Jacobellis' uses of force were in legitimate furtherance of not only protecting each other, but also Goodwin and the community at large by gaining control over him

17

through their minimal uses of force. As a result, the gravity of the intrusion on Goodwin was minimal and the need for that intrusion was reasonable under the circumstances. The Court should find that the officers respective uses of force did not violate Goodwin's Fourth Amendment right against excessive force.

## IV.   PLAINTIFF'S MALICIOUS PROSECUTION CLAIM FAILS (COUNT 3).

### A.   There Was Probable Cause to Prosecute Plaintiff and There Is No Evidence Defendants Improperly Influenced the Prosecutor's Decision.

To prevail on a § 1983 malicious prosecution claim, a plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Lacy*, 631 F. Supp. 2d at 1195 (citation and quotation omitted). "Malice is present where the defendant initiate[d] or procure[d] the proceedings . . . primarily for a purpose other than that of bringing an offender to justice[.]" *West v. City of Mesa*, 128 F. Supp. 3d 1233, 1246 (D. Ariz. 2015) (citation omitted). "[M]alice and the lack of probable cause are separate elements of the tort of malicious prosecution. Evidence of lack of probable cause allows, at most, a mere inference, but not a necessary one, of malice." *Shelburg v. City of Scottsdale Police Dep't*, 2010 WL 3327690, at *10 (D. Ariz. Aug. 23, 2010). Finally, "[a]n individual seeking to bring a malicious prosecution claim must generally establish that the prior proceedings terminated in such a manner as to indicate his innocence." *Awabdy,* 368 F.3d at 1068. For the termination of a proceeding to be considered favorable, it generally must involve a "determination on the merits." *Jaisinghani v. Byrne*, 120 Fed.Appx. 47, 49 (9th Cir. 2005). But a termination "short of a complete trial on the merits" may serve as a favorable termination "if it reflects the opinion of the prosecuting party or the court that the action lacked merit or would result in a decision in favor of the defendant." *Awabdy,* 368 F.3d at 1068 (citations omitted).

Plaintiffs cannot satisfy their burden of proving malicious prosecution against either Defendant officer because, as already addressed above, it is ***admitted*** there was probable cause to arrest Plaintiff, thereby extinguishing his malicious prosecution claim. Additionally, as the body-cam footage of the incident shows, the officers did not harbor any overt ill-will

or disdain for Plaintiff sufficient to establish that malice existed. Finally, Plaintiff cannot establish that the prior proceedings terminated in his favor. The matter did not resolve because it lacked merit or would result in a decision in favor of the defendant. Instead, Goodwin was deemed incompetent to stand trial, and therefore, Plaintiffs cannot establish a required element of a malicious prosecution claim that the proceedings terminated in his favor on the merits. *Milke v. City of Phx.*, 2016 WL 5339693, * 10 (D. Ariz. Jan 8, 2016) ("[w]ithout specific evidence establishing the criminal prosecution had been terminated because the plaintiff had been found innocent, the malicious prosecution case could not proceed."); *Bagley v. City of Sunnyvale*, 2017 WL 344998 (N.D. Cal. 2017) (Unreported) (Plaintiff insufficiently pled a malicious prosecution claim where the prosecution was terminated due to a determination of mental incompetency). For those multiple independent reasons, Plaintiffs' malicious prosecution claim fails as a matter of law and undisputed facts.

Even if Plaintiff tries to prove a malicious prosecution claim against Defendants asserting they "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct . . . causing the initial of legal proceedings," *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004), such a claim also fails. First, there is no evidence, beyond speculation, that either officer improperly exerted pressure on a prosecutor, knowingly provided misinformation, concealed exculpatory information, or engaged in any other wrongful conduct. The record shows that an independent investigating officer, Rucker, submitted the information and evidence (including the body camera footage) to the prosecutor who then independently determined whether to prosecute Goodwin.[20] The decision to file a criminal complaint (or prosecute a case) is presumed to result from an independent determination by the prosecutor and precludes liability for those who

---

[20] The Defendant officers, as victims of Goodwin's assault and biting had every right to have charges brought against Goodwin. Yet, the Defendant officers only ever booked Plaintiff into jail and never requested the prosecutor bring any charges.

participated in the investigation. *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981).[21] Moreover, as shown above, there is no evidence to rebut this presumption. Thus, Plaintiff's malicious prosecution claim fails for this reason alone.[22]

## V.   JACOBELLIS AND SHERF ARE ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' VARIOUS 42 U.S.C. § 1983 CLAIMS.

The doctrine of qualified immunity protects government agents from liability for good faith actions while exercising discretionary authority in their official capacity. *Sonoda v. Cabrera*, 255 F.3d 1035, 1042 (9th Cir. 2001). Government officials performing such discretionary functions are generally shielded from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The United States Supreme Court has clarified the importance and burden of a plaintiff opposing a motion for summary judgment on a § 1983 claim to provide the Court with ***specific*** case law that put government agents on notice that their conduct violated clearly established law. *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017). "The 'clearly established' standard ... requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). "This

---

[21] The plaintiff bears the burden of producing evidence to rebut such a presumption: that the prosecutor did not act independently. *Newman v. Orange Cty.*, 457 F.3d 991, 993 (9th Cir. 2006). This evidence is not minimal but requires evidence "that the district attorney was subjected to unreasonable pressure by the police officers, or that the officers knowingly withheld relevant information with the intent to harm [Plaintiff], or that the officers knowingly supplied false information." *Id.* at 994 (quotation omitted).

[22] In addition, any argument that Defendants did not discuss or report his alleged mental illness in their police reports also fails. Even taking Plaintiff's allegations as true, the claim fails because deliberate fabrication in violation of due process rights "must mean something more than mere omission." *O'Doan*, 991 F.3d at 1045. But in any event, the officers did in fact include Goodwin's alleged mental illness in the police report. It was reported that "[t]he mother said that Brandon was disabled and had autism." The report stated that Brandon's mother insisted that Brandon be transported to FMC for an evaluation "due to him not having his medications in almost 24 hours" and that "Brandon was subsequently transported to FMC for an evaluation." Under these similar circumstances, the Court in *O'Doan* stated that "while we can agree that more information is usually better than less and that including more specific information and [possible seizure] would have been preferable, the question here is whether officer violated clearly established law. It is plain they did not." *Id.* at 1045-46.

20

requires a high 'degree of specificity.'" *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1229 (D. Ariz. 2019). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* Thus, the dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### A.   Qualified Immunity For Stopping And Arresting Goodwin.

Here, no case put the Officers on notice that their initial *Terry* stop of Goodwin was unconstitutional. The stop at issue resembles many of the seminal cases affirming an officer's right to conduct a traffic stop. Moreover, the officers directly observed Goodwin in the middle of the street providing not only reasonable suspicion, but probable cause justifying their stop. Moreover, after Goodwin refused to obey officer commands and became violent and fought with the Officers, probable cause admittedly existed for his arrest. Again, no case would have put the officers on notice they lacked probable cause to arrest Goodwin at this point. *See e.g.*, *Wesbrock v. Ledford*, 464 F. Supp. 3d 1094, 1105 (D. Ariz. 2020) (noting qualified immunity may apply for arrest of suspect where Glendale Defendants had a reasonably arguable basis for believing, even after their investigation, that there was probable cause to arrest plaintiff for trespassing and/or for refusing to provide his name after advisement (A.R.S. § 13-2412(A)); *Reed v. Lieurance*, 863 F.3d 1196, 1204-05 (9th Cir. 2017) ("[I]f an officer makes an arrest without probable cause, he or she may be entitled to qualified immunity as long as it is reasonably arguable that there was probable cause for the arrest.").

### B.   Qualified Immunity for The Officers' Respective Uses of Force.

In the Fourth Amendment excessive force context, "specificity is especially important," *Mullenix v. Luna*, 577 U.S. 7 (2015), and "thus police officers are entitled to qualified immunity unless existing precedent *squarely* governs the specific facts at issue," *Kisela*, 138 S.Ct. at 1153 (emphasis added); *see also Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019); *Ventura v. Rutledge*, 2020 WL 6192981, at *2 (9th Cir. Oct. 22, 2020).

#### 1.   No Case Law Put Sherf On Notice a Bearhug Under the Circumstances of This Case Would Violate Plaintiffs' Rights.

As stated above, the Ninth Circuit held twice this year alone, under similar facts, that a takedown maneuver on an actively aggressive suspect was constitutional. *See e.g.*, *O'Doan*, 991 F.3d 1027; *Silva*, 2021 WL 1041713. It is Plaintiffs burden at summary judgment to show some other case with substantially similar facts put the officers on notice that their conduct would have violated Plaintiffs' rights, which Defendants assert does not exist. When none exist, as Defendants assert here, Sherf is entitled to qualified immunity.

2. **No Case Law Put Jacobellis On Notice Head Strikes Under the Circumstances of This Case Would Violate Plaintiffs' Rights.**

The Ninth Circuit has made clear that where a suspect is ***actively*** resisting arrest, refusing lawful commands, and being an aggressor on an officer, as in this case, the use of head strikes to gain compliance are appropriate. *See e.g.*, *Ames v. King County, Washington*, 846 F.3d 340, 350 (9th Cir. 2017) (holding officers entitled to qualified immunity for three head slams of suspect to the ground where suspect refused officer commands, resisted being pulled from her truck, and (whether or not by choice) was not submitting to being handcuffed); *Goldsby v. City of Henderson Police Dep't*, 2020 WL 7645495, at *7 (D. Nev. Nov. 13, 2020) (officers use of repeated head strikes on resisting suspect was objectively reasonable and entitled to qualified immunity); *A.B. v. Cty of San Diego*, 2020 WL 5847551, at *17 (S.D. Cal. Oct. 1, 2020) (holding fist and sap strikes did not violate clearly established law and distinguishing *Blankenhorn* from case given that the suspect actively resisted arrest and tried to flee)[23]; *Black*, 2020 WL 5834789, at *9 (granting qualified immunity for officer punching biting suspect in the face). Based on the above, no case with specific facts similar to

---

[23] The seminal case in the Ninth Circuit involving impact strikes is *Blankenhorn*, 485 F.3d 463. There, the Court held that punching a **non-resisting** plaintiff while he was on the ground being handcuffed was unreasonable. *Id.* at 469-70, 480. Here, the undisputed facts are diametrically different. Plaintiff resisted arrest for more than a minute – it took over a full minute to gain control over him after he was taken to the ground. Moreover, Goodwin cannot reasonably argue that he did not actively resist arrest on the ground, attempt to bite and bite the officers, and refuse their lawful commands to stop resisting to allow the officers to handcuff him. Given these undisputed facts, *Blankenhorn* fails to put the officers on notice that their conduct would have violated Plaintiff's Fourth Amendment rights under the circumstances of this particular case.

this case that put Jacobellis on notice that his acts would violate Goodwin's rights. Jacobellis is entitled to qualified immunity.

### 3. No Case Law Put the Officers on Notice That Goodwin's Alleged Mental Illness Precluded Their Terry Stop or Use of Force.

Finally, Defendants are unaware of any case establishing that an individuals' purported mental illness negates valid reasonable suspicion and/or probable cause to make an investigatory stop and when that individual becomes violent to not use appropriate force to control and arrest that individual.

### C. Qualified Immunity For Plaintiff's Malicious Prosecution Claim.

As stated above, the existing Ninth Circuit authority only put the officers on notice that a malicious prosecution claim exists in the absence of probable cause, malice, an intent to deprive an individual of their constitutional rights, and a successful prevailing on the merits of the prosecution—which Plaintiff cannot establish. Thus, Defendants are also entitled to qualified immunity on Plaintiffs' malicious prosecution claim.

## VI. PLAINTIFF'S *MONELL* CLAIM FAILS (COUNT 4).

### A. Without a Constitutional Violation There Can Be No *Monell* Claim.

Under 42 U.S.C. § 1983, if there is no constitutional violation, the municipality cannot be held liable as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Here, as set forth above, because Plaintiffs suffered no constitutional violation by the individual Defendants (or because Defendants are entitled to qualified immunity), summary judgment is appropriate on Plaintiffs' *Monell* claim. *See Daily v. City of Phoenix*, 2017 WL 6527298, at *9 (D. Ariz. Aug. 8, 2017) affirmed in part, reversed in part on other grounds, 765 Fed.Appx. 325 (9th Cir. 2019).

### B. Failure to Train.

To establish a "policy" of inadequate training, Plaintiff must offer "proof of facts evidencing the local government's awareness of a high probability of harm if the government failed to act." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1453 (9th Cir. 1991). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to

23

demonstrate deliberate indifference for purposes of failure to train[.]" *Flores v. Cty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014). After all, "[w]ithout notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Moreover, Plaintiff must identify a specific deficiency in the City's training or supervision and establish the deficiency directly caused the constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Atwood v. Town of Ellington*, 427 F. Supp. 2d 136, 145 (2006). Plaintiff must also show the City made a "conscious" or "deliberate" policy decision knowing this incident would likely result. *City of Canton*, 489 U.S. at 389. Thus, municipal liability "is at its most tenuous where a claim turns on a failure to train." *Connick*, 131 S. Ct. at 1359. Simply put, the City cannot be held liable absent sufficient evidence of a "program-wide inadequacy in training." *Blankenhorn*, 485 F.3d at 484–85.

Plaintiffs' *Monell* training claim fails because he cannot refute that the individual officers completed all training requirements for AZPOST certification. *See Mendez v. Cnty. of San Bernardino*, 540 F.3d 1109, 1123 (9th Cir. 2008), *overruled on other grounds*, *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (affirming dismissal where plaintiff failed to controvert evidence that officer's training met state POST requirements); *Hillbloom v. Cty. Of Fresno*, 2010 WL 4481770, at *11, 34 (E.D. Cal. Nov. 1, 2010); *see also Ward v. Still*, 2012 WL 37518, *13-14 (E.D. Tenn. 2012) ("If . . . police officers were certified by the POST Commission, then the issue of the adequacy *vel none* of their training is resolved."). As set forth above, the City went well beyond AZPOST certification requirements with its CIT program—which Sherf was certified under.

The record also lacks evidence of any pattern of deficient training to put the City on notice that its training and policies on police procedures, traffic stops, or use of force were deficient. *Flores*, 758 F.3d at 1159. The City's policy on use of force properly instructed officers on the appropriate scope of force and how to address mentally ill or developmentally disabled people. There was thus no formal or informal policy, practice, or custom by the City that was the moving force behind Plaintiff's injuries. Nor was there any formal or informal

24

policy, practice, custom, or procedure that constituted deliberate indifference toward Plaintiffs' rights. Thus, if Plaintiff asserts *Monell* liability because the Officers were not properly training, such an argument cannot establish *Monell* liability. *See City of Canton*, 489 U.S. at 390-91.

### C.   Failure to Supervise.

"Usually, a failure to supervise gives rise to section 1983 liability only in situations in which there is a history of widespread abuse." *Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir.1982) (emphasis added); *see also Santos ex rel. Santos v. City of Culver City*, 228 Fed.Appx. 655, 659 (9th Cir. 2007) (affirming the district court's grant of summary judgment on a *Monell* claim under the "moving force" prong because there was no evidence of a causal link between city's policies and the officer's actions); *D.T. ex rel. M.T. & K.T. v. Indep. Sch. Dist. No. 16*, 894 F.2d 1176, 1180, 1192–93 (10th Cir. 1990) (holding a school district's policy of supervising its employees was not the "moving force" behind a teacher's alleged molestation of students because there was insufficient evidence of a direct causal link between only sporadic supervision and later molestations).

Here, the record shows that the Officers were adequately and routinely supervised while they were in the field. Moreover, no evidence shows the City should have provided more supervision to these Officers because neither had any prior discipline for excessive use of force and were adequately trained. Defendants are unaware of any authority requiring officers to be constantly operating under an acting supervisor while on duty. Moreover, even if such supervision were required, such purported failure amounts to a single incident of officer misbehavior, which cannot establish *Monell* liability. *McDade v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000); *Vasquez v. City of Santa Paula*, 2015 WL 12734071, at *3 (C.D. Cal. Mar. 11, 2015). Plaintiffs also fail to allege a specific deficiency in the City's policies, training, and supervision that directly caused his constitutional deprivation. But even assuming they did, Plaintiffs do not plead any facts that show that such a policy is so widespread that it demonstrates a claim under *Monell*. Nor will Plaintiffs be able to show that any alleged failure

to train or supervise amounted to a deliberate indifference to the rights of persons with whom the officers may encounter.

### D. The City of Flagstaff Properly Investigated and Disciplined Its Employees For Policy Violations.

Finally, Plaintiffs appear to have alleged that the City purportedly fails to properly investigate and discipline its employees for policy violations. To bring such a claim Plaintiffs were required to prove, which they cannot, that there were widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded. *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir.2005); *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir.1986). But beyond Plaintiffs' speculative allegations, there is simply no evidence to support them. The undisputed record shows FPD routinely investigates its officers' conduct. [**DSOF ¶ 137**] Moreover, when an allegation of wrongdoing is sustained, officers will receive some form of discipline, reprimand, remedial training, and/or termination where appropriate. [**DSOF ¶ 138**].[24] Additionally, there have been times that the Chief of Police may disagree with command staff's recommended discipline or investigative findings and sustain a policy violation. [**DSOF ¶ 139**]. As further evidence that the Chief does not stick his head in the sand, at times more investigation in certain use of force incidents is requested to decide whether the force was justified. [Ex. 12, Musselman Depo at p. 99:2-8]. Thus, there is neither evidence of repeated widespread unconstitutional customs or practices nor evidence of the City's refusal to discipline or even discharge its officers for improper conduct.

## VII. PLAINTIFFS' ADA TITLE II CLAIMS FAIL (COUNTS 5 AND 6).

Plaintiffs' ADA Title II claim fails for several reasons at summary judgment. First Plaintiffs do not state directly who the ADA claims are against. To the extent these claims are against the officers, they fail because ADA claims are cognizable only against public entities,

---

[24] For instance, in 2019 City of Flagstaff received 56 citizen complaint and 14 IA Investigation complaint. Of the 56 citizen complaints, 20 were either sustained or partially sustained. Of the 14 IA Investigation complaints received, 9 were sustained. Of the 21 total sustained complaints, FPD disciplined officers 20 times. [*See* Ex. 14 (NUI Response # 11)].

not individuals. *Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1041 (D. Ariz. 2019), *aff'd sub nom. C.L. by & through Leibel v. Grossman*, 798 F. App'x 1015 (9th Cir. 2020) (citing *Voiles v. Reavis*, 2014 WL 5092664, *15 (S.D. Cal. 2014)).

Second, Plaintiffs' ADA claims against the City fails because although Title II of the ADA "applies to arrests", the Ninth Circuit has noted that "exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment." *Sheehan v. City and Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) (citing *Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 175 (4th Cir. 2009); *see also* 28 C.F.R. § 35.139 (stating that "when [an] individual poses a direct threat to the health and safety of others", the public entity does not have to permit the person to participate in or benefit from its services or activities). Thus, in the wrongful arrest context, Title II of the ADA is violated "where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity." *Id.* "To prevail on a theory of wrongful arrest under the ADA, [C.L.] must prove that (1) he was disabled; (2) [Officers] knew or should have known he was disabled; and (3) [Officers] arrested him because of legal conduct related to his disability." *Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1041–42 (D. Ariz. 2019), aff'd sub nom. *C.L. by & through Leibel v. Grossman*, 798 F. App'x 1015 (9th Cir. 2020).

Here, even if the first factor can be satisfied based on Goodwin's alleged disability, the claim still fails the other two factors. Indeed, at the time of Goodwin's arrest, Defendant officers did not know or should have known that Goodwin was disabled. Not until after the arrest was effectuated did Krakauer inform Defendants that Goodwin was autistic. Further, Plaintiffs will be unable to prove the third requirement, that Goodwin was arrested because of **legal** conduct related to his disability. Goodwin assaulted Jacobellis. Plaintiffs admit probable cause existed to arrest Goodwin after this assault. Such assault is not legal conduct related to Goodwin's disability. Thus, this claim fails as a matter of law.

Third, if Plaintiffs allege a Title II claim grounded in a public entity's alleged failure to provide a reasonable accommodation under 28 C.F.R. § 35.130(b)(7), the plaintiff bears the

initial burden of producing evidence of the existence of a reasonable accommodation. *See Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002). In analyzing a failure to accommodate claim in the context of force used during an arrest, the court in *Leibel v. City of Buckeye*, noted that a failure to accommodate claim assumes that the original decision to conduct the arrest was lawful. 364 F. Supp. 3d at 1042. Because of this standard, the court held that the officer—even for purposes of the ADA claim—"was entitled to use some degree of physical coercion to complete the arrest sequence." *Id.* at 1043 (citing *Graham*, 490 U.S. at 396). The court held that "[a]lthough [disabled individual's] condition may render him more sensitive to physical force than others, [he] has not identified any authority suggesting a police officer must—to avoid liability under the ADA—refrain from using any force if he learns (or comes to suspect) the person he's in the process of lawfully arresting is autistic. *Id.* The court also held that the individual's injuries resulted from the decision to arrest, not from any officer's failure to accommodate his condition after the lawful arrest was completed and the situation was defused. *Id.* Here, the facts at hand are completely similar to the facts in *Leibel*. Any injuries Goodwin may have suffered occurred during a lawful arrest and not after the situation was defused. Thus, this claim fails as a matter of law.[25]

## VIII. PLAINTIFFS' STATE LAW CLAIMS FAIL.

### A. Defendants Are Entitled to Common Law Qualified Immunity on All of Plaintiffs' State Law Claims.

Defendants are entitled to qualified immunity on Plaintiffs' state-law claims. The Arizona Court of Appeals, in *Spooner v. City of Phx.*, 246 Ariz. 119, ¶ 8 (App. 2018), clarified

---

[25] Additionally, Plaintiff cannot recover any monetary damages under Title II of the ADA because he cannot prove intentional discrimination on the part of the Defendant. *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). To prove intentional discrimination, Plaintiff has to prove that the City acted with a deliberate indifference. *Id.* "A deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Id.* at 1139. Defendants did not intentionally discriminate against Plaintiff. Instead, Defendant officers used only objectively reasonable force after Goodwin assaulted Jacobellis. *See Updike v. Multnomah Cty.*, 870 F.3d 939, 951–52 (9th Cir. 2017) (deliberate indifference "must be a result of conduct that is more than negligent" (quotations omitted)); *see also O'Doan*, 991 F.3d at 1045 n.3 (finding that the plaintiff would not support a wrongful arrest claim against the City under the ADA after determining that the officers did not violate any clearly established law in arresting plaintiff).

that common law qualified immunity for public officials exists under Arizona law "provid[ing] public officials, including police officers, limited protection from liability when 'performing an act that inherently requires judgment or discretion.'" *Id.* at ¶ 9 (quoting *Chamberlain v. Mathis*, 151 Ariz. 551, 555, 558 (1986)). "If qualified immunity applies, a public official performing a discretionary act 'within the scope of [her] public duties' may be liable only if she 'knew or should have known that [s]he was acting in violation of established law or acted in reckless disregard of whether h[er] activities would deprive another person of their rights.'" *Id.* at ¶ 10. In this case, under *Spooner* and its progeny's framework[26], Defendants' actions no doubt involved judgment and discretion, and thus qualified immunity is warranted. Thus, Plaintiffs state law tort claims against Defendants: assault and battery, intentional infliction of emotional distress, and violation of Title 36–551.01 are barred by common law qualified immunity Arizona law, requiring summary judgment on all of Plaintiffs' state law claims.

## B. Plaintiffs' Assault/Battery/IIED Claims Fail Under Arizona's Justification Statutes (Count 7).

Defendants' use of force against Goodwin was justified under A.R.S. § 13–409 because they used the force "in making an arrest or detention" of Plaintiff and "a reasonable person would believe such force [wa]s immediately necessary to effect the arrest or detention," and "a reasonable person would believe the arrest or detention [was] lawful." A.R.S. § 13–409(A)(1)–(3). Because Defendants' use of force is justified under A.R.S. §§ 13–404 and –409, they are immune from civil liability on Plaintiff's intentional tort claims. *See Ryan v. Napier,* 245 Ariz. 54, 63 (2018) (citing A.R.S. § 13–413).

## C. Plaintiffs' Assault/Battery Claims Fail on Their Merits (Count 7).

---

[26] *See also Sweet v. City of Mesa*, CV-17-00152-PHX-GMS, 2019 WL 3532187, at *9 (D. Ariz. Aug. 2, 2019) (acknowledging the availability of common law qualified immunity for wrongful death torts, but deferring any ruling until depositions were completed); *Merritt, v. Arizona*, 2019 WL 6050237, at *21 (D. Ariz. Nov. 15, 2019) (citing Spooner in granting summary judgment to an officer on a plaintiff's negligence claim based on common law qualified immunity); *Johari v. City of Tempe*, 2019 WL 4451348, at * 1 (D. Ariz. Sep. 17, 2019) (applying common law qualified immunity to state law claim for malicious prosecution); *Carroll v. Robinson*, 178 Ariz. 453, 456–58 (App. 1994) (affirming the grant of common law qualified immunity to claims of intentional infliction of emotional distress).

9482757.1

As discussed above, Defendants' use of force in apprehending and subduing Goodwin, including by striking him, were objectively reasonable and did not violate his constitutional rights. Thus, Plaintiff's assault and battery claim fails. Despite the above, "to succeed on an assault claim a plaintiff must prove that the defendant acted with intent to cause another harmful or offensive contact or apprehension thereof, and the other person apprehend[ed] imminent contact." *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1044 (D. Ariz. 2017) (quotation and citation omitted). Under Arizona law, however, self-defense and justification are affirmative defenses to assault and battery claims. *Id.*; A.R.S. §§ 13–402, 13–404, 13–409, 13–410, 13–411, and 13–421. "A person is justified in threatening or using physical force against another when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force." A.R.S. § 13–404(A). Here, as addressed above, the officers acted with lawful authority and in self-defense when exercising their use of force in taking Goodwin to the ground and striking him to protect themselves or others from Goodwin given that he had assaulted and continued to assault Jacobellis by biting him, repeatedly attempted to bite the officers, and was wandering in the middle of the road and approaching a busy intersection. The justification and self-defense statutes therefore insulate Defendants from any liability for Plaintiff's state law claims. *See* A.R.S. § 13-413.

**D.      Plaintiff's IIED Claim Fails on Its Merits (Counts 8 and 9).**

An IIED claim has three elements: "*first*, the conduct by the defendant must be extreme and outrageous; *second*, defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from this conduct; and *third*, severe emotional distress must indeed occur as a result of the defendant's conduct." *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987). Plaintiffs' claims fail at each step in the analysis.

First, as shown above, *supra* § III, Defendants' conduct was objectively reasonable and justified; and therefore, neither extreme nor outrageous. But even if the conduct was not justified, Plaintiffs cannot prove the conduct at issue rises to the level of being extreme and outrageous. To survive summary judgment, the plaintiff must also show that the defendant's

acts were "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Cluff v. Farmers Ins. Exch.*, 10 Ariz. App. 560, 562 (1969). The issue may only go to the jury where "reasonable minds may differ." *Nelson v. Phx Resort Corp.*, 181 Ariz. 188, 199 (App. 1994). Thus, "[e]ven if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" *Nelson,* 181 Ariz. at 199. Rather, "conduct necessary to sustain an intentional infliction claim falls at the very extreme edge of the spectrum of possible conduct." *Watts v. Golden Age Nursing Home*, 127 Ariz. 255, 257 (1980). Here, the officers were merely reacting to a violent and rapidly evolving altercation over the course of a minute and in response to Goodwin's increasingly violent behavior. Their conduct cannot, as a matter of law, be defined as extreme and outrageous.

Second, no evidence exists that that Defendants intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result. Instead, the evidence shows that Defendants' use of force came only after Goodwin assaulted Jacobellis. Defending oneself, or in the case of Sherf, defending another officer from an assault, is not a sufficient basis to find any intention to cause emotional distress.

Third, Krakauer cannot provide any evidence that the subject incident caused her *severe* emotional distress. "A line of demarcation should be drawn between conduct likely to cause mere 'emotional distress' and that caused 'severe emotional distress.'" *Midas Muffler Shop v. Ellison*, 133 Ariz. 194, 199 (App. 1982) (citation omitted); *see also* Restatement (Second) of Torts § 46 cmt. j (1965) (liability arises only when emotional distress is extreme; "Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people.").

Plaintiffs also failed to disclose any admissible evidence that they have actually suffered *severe* emotional distress as a result of the subject incident. [**DSOF ¶ 142**] Plaintiff Krakauer disclosed no medical expert who will opine that she suffered severe emotional distress as a result of this incident. [**DSOF ¶ 143**] Nor have Plaintiffs provided any evidence

31

that Plaintiffs sought mental health treatment for this incident. [**DSOF ¶ 144**] Instead, the uncontradicted evidence is that Krakauer was not severely disturbed by what happened as her statements evidence, including thanking the officers for getting Goodwin and blaming other law enforcement agencies for what occurred. Krakauer also testified to a myriad of stressors in her life. [**DSOF ¶145(a)-(k)**] Thus, crying, being stressed and upset, and occasional trouble sleeping are not enough to establish severe emotional distress. *Midas*, 133 Ariz. at 199.

### E.    Plaintiffs' Title 36 Claim Fails (Count 12).

Plaintiffs bring a claim under A.R.S. § 36–551.01.[27] But this statute pertains to individuals *receiving treatment*. There is no evidence that Goodwin was a patient receiving treatment under the definition of this chapter. Even if he were, however, he still would be unable to bring these claims because other remedies exist under federal and state law, as sought in Plaintiff's complaint under 42 U.S.C § 1983 and Arizona tort law. *See* A.R.S. § 36-551.01(S) ("Any person with a developmental disability … who believes that his rights… have been violated has a right to petition the superior court[28] for redress *unless other remedies exist under federal or state laws.*") (emphasis added); *see also Gonzales v. Palo Verde Mental Health Servs.* 162 Ariz. 387, 391 (App. 1989) (noting that a dismissed claim under Title 36 was encompassed by a general negligence claim that was still pending). Finally, as addressed at length above, Goodwin was not denied any rights under the Constitution or Arizona law as a result of his purported disability. Thus, Plaintiff's Title 36 claim must be dismissed.

### IX.   DAMAGES CLAIMS FOR BACK INJURIES MUST BE DISMISSED.

Plaintiffs alleged that Goodwin suffered a back injury that "may be the result" of the subject incident. [**DSOF ¶ 146-148**]. As addressed in Defendants' separately filed Daubert

---

[27] "A person with a developmental disability in this state shall not be denied as the result of the developmental disability the rights, benefits, and privileges guaranteed by the constitution and laws of the United States and the constitution and laws of this state. The rights of persons with developmental disabilities which are specifically enumerated in this chapter are in addition to all other rights enjoyed by such persons. The listing of rights is not exclusive or intended to limit in any way rights which are guaranteed to persons with developmental disabilities under state and federal laws."

[28] Plaintiff also failed to petition the "superior court" for applicable remedies as required.

1  motion on Kirstin Howell, Plaintiff's treating physicians cannot provide causation opinions

2  because such opinions were not properly disclosed and must be excluded by this Court. With

3  no medical evidence establishing the causal link from this incident to Goodwin's alleged back

4  injuries, Plaintiff damages claim necessarily fails. *Fuqua v. Dollar Tree Stores, Inc*, 2014 WL

5  1517736, * 6 (Ariz. App. 2014); *see also Salde v. Stanton*, 135 Ariz. 76, 78 (1983); *Auto-Owners

6  Ins. v. ASPAS*, 2018 WL 4643190, (W.D. Ky. Sep. 27, 2018).

7  **X.    PLAINTIFFS' PUNITIVE DAMAGES CLAIM FAILS.**

8         Plaintiff cannot recover punitive damages against the Defendants. While Section 1983

9  only allows [individual capacity] punitive damages "when the defendant's conduct is shown to

10  be motivated by evil motive or intent, or when it involves reckless or callous indifference to

11  the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Conduct is

12  malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring another.

13  *Dang v. Cross*, 422 F. 3d 800, 807 (9th Cir. 2005). Conduct is in reckless disregard of the

14  plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's

15  safety, rights, or the defendant acts in the face of a perceived risk that his actions will violate

16  the plaintiff's rights under federal law. *Id.* Here, for all the reasons the Defendants acted

17  objectively reasonable and were justified, punitive damages are unavailable. Punitive damages

18  are also unavailable for Plaintiffs' state-law claims against all Defendants under A.R.S. § 12–

19  820.04 because they are either a public entity or a public employee acting within the scope of

20  their employment. *See* A.R.S. § 12–820.04.

21  **XI.    DEFENDANTS REQUEST THEIR ATTORNEYS' FEES.**

22         Before this motion was filed, undersigned counsel repeatedly conferred both orally

23  and in writing with counsel on the frivolous nature of the malicious prosecution and Title 36

24  claims. [*See* **DSOF ¶ 151**]. Plaintiffs' counsel has refused to dismiss these claims. Pursuant to

25  Fed.R.Civ.P. 11., 42 U.S.C. § 1988(b) and A.R.S. § 12-349, Defendants seek their fees

26  incurred in defending these claims and any claims intertwined therewith.

27  **XII.   CONCLUSION.**

28         Based on the above, Defendants are entitled to summary judgment on all claims.

9482757.1

1

2      DATED this 11th day of June, 2021.

3                              JONES, SKELTON & HOCHULI, P.L.C.

4

5                              By /s/ Michele Molinario
                                  Michele Molinario
6                                 Justin M. Ackerman
                                  Derek R. Graffious
7                                 40 North Central Avenue, Suite 2700
                                  Phoenix, Arizona 85004
8                                 Attorneys for Defendants City of Flagstaff,
                                  Nicholas Jacobellis, and Ryan Sherf
9

10                          **CERTIFICATE OF SERVICE**

11         I hereby certify that on this 11th day of June, 2021, I caused the foregoing

12   document to be filed electronically with the Clerk of Court through the CM/ECF System

13   for filing; and served on counsel of record via the Court's CM/ECF system.

14

15   /s/Karen Gawel

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      34

9482757.1