SKC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Elizabeth Krakauer, | No.  CV-20-08090-PCT-GMS (ESW) |
| Plaintiff, | |
| v. | **ORDER** |
| Flagstaff, City of, et al., | |
| Defendants. | |

Plaintiff Elizabeth Krakauer, who is represented by counsel, brought this civil rights action individually and as guardian on behalf of her adult son, Brandon Gabriel Goodwin, based on alleged civil rights violations during Brandon's arrest by Flagstaff police. Defendants the City of Flagstaff (the City) and Flagstaff police officers Nicholas Jacobellis and Ryan Sherf (Defendant Officers) move for summary judgment. (Doc. 87.)  The Motion is fully briefed.  (Doc. 95, 116).  Defendants have also filed *Daubert* Motions to Exclude Plaintiff's police and medical experts (Docs. 68, 69), which are fully briefed (Docs. 78, 79, 82, 83), and Plaintiff has filed Motions to strike both these Motions (Docs. 80, 81), which Defendants oppose (Docs. 90, 91).

The Court will grant Defendants' Motion for Summary Judgment, deny the remaining Motions as moot, and terminate this action.

. . . .

. . . .

1    **I.      Complaint**

2          In her First Amended Complaint, Plaintiff claims that Defendants violated

3    Brandon's and her civil rights under 42 U.S.C. § 1983, the Americans with Disabilities Act

4    (ADA), and Arizona law.  (Doc. 13.)  These claims arise from the following allegations:

5          Brandon is a severely disabled adult who has been diagnosed with schizophrenia,

6    multiple personality disorder, and autism.  (Doc., 13 ¶ 4.)  His disabilities are sufficiently

7    profound that all parties stipulate that he is incompetent to render testimony of any kind in

8    this matter. (Doc. 58.)  On April 27, 2019, Plaintiff and Brandon were arrested by the

9    Arizona Department of Public Safety (DPS) near Williams, Arizona, for driving with a

10   cracked windshield.  The DPS impounded Plaintiffs' van at  an impound yard in Ashfork,

11   Arizona, about 45 miles west of Flagstaff.  It confiscated all of Brandon's prescribed

12   medications and transported and booked Plaintiff and Brandon into the Coconino County

13   Jail in Flagstaff.  Brandon—deprived of all his medications—decompensated quickly.  (*Id.*

14   ¶¶ 8−9.)  The next day, at approximately 1:00 p.m., Plaintiff and Brandon were released,

15   but their van and possessions were all in Ashfork, and they had no way to get to them

16   without assistance.  (*Id.* ¶ 10.)  They exited the jail into the joint parking lot with the

17   Flagstaff Police Department (FPD), and Plaintiff called the FPD to request assistance

18   retrieving their van while Brandon, completely and involuntarily unmedicated, began

19   pacing the parking lot and talking loudly to himself, prompting an off-duty police officer

20   to notify dispatch.  (*Id.* ¶¶ 11−12.)

21          Sgt. Jacobellis responded and approached Brandon, asking if he needed police

22   assistance.  Brandon walked off without responding.  Then, while Plaintiff explained to

23   Sgt. Jacobellis that Brandon needed his medications, Brandon left the parking lot and began

24   walking north on the east side of Sawmill Road Plaintiff started to follow him.  (*Id.* ¶¶

25   13−19.)  After a police aide radioed that Brandon was standing in the roadway, Sgt.

26   Jacobellis and Officer Sherf, who had also responded to the parking lot, got into their

27   vehicles and sped to Brandon's location. Sgt Jacobellis stopped his vehicle at an angle

28   along the roadway in front of Brandon, blocking Brandon's way forward.  (*Id.* ¶¶ 20−25.)

While Brandon walked in the roadway to get around the police car, Sgt. Jacobellis approached Brandon with his hands up to signal "stop" and attempted to talk to Brandon. Brandon was nonresponsive and displaying typical signs of autism or mental illness. (*Id.* ¶¶ 25−27.) Without speaking, Brandon stepped forward and shoved Sgt. Jacobellis in the chest, then stepped backwards. Thereafter Officer Sherf took Brandon to the pavement. Defendant Officers forced Brandon's head into the pavement struck him on the cheek, and then arrested him for obstruction of a highway, aggravated assault on a police officer, and resisting arrest. (*Id.* ¶¶ 28−46.) Following Brandon's arrest, the Coconino County Attorney's Office prosecuted Brandon but ended up dismissing the charges against him after a competency hearing confirmed that Brandon suffers from schizophrenia, autism, and multiple personality disorder. (*Id.* ¶¶ 47−48.) Brandon claims loss of liberty, extreme emotional distress, trauma, physical injury, pain, and humiliation. Plaintiff makes claims for extreme emotional distress upon observing the cruel, inhumane, and excessive force used on her son. (*Id.* ¶ 49.)

Plaintiff brings the following claims: in Counts One through Three, § 1983 claims for wrongful arrest, excessive use of force, and malicious prosecution against the officers; in Count Four, a *Monell* claim against the City for failure to train and supervise; in Counts Five and Six, ADA claims against the City for failure to accommodate and wrongful arrest; in Counts Seven, Eight, Nine, and Twelve, state law claims against Defendant Officers for assault and battery, intentional infliction of emotional distress, and violation of the rights of a person with a developmental disability.[1]

## II.   Legal Standards

### A.   Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The

---

[1] The First Amended Complaint skips from Counts Nine to Twelve and therefore contains only ten, not twelve, claims.

movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## B. Video Evidence

Where video evidence is available in an excessive use-of-force case, the Supreme Court has stated that courts "should [] view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380−81. This does not mean that courts no longer take the nonmovant's version of the facts as true where video evidence, seen in a light most favorable to the nonmoving party, leaves room for genuine dispute. Courts must still draw all reasonable inferences in the nonmovant's favor. *Williams v. Las Vegas Metro.*

*Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

## III.   Section 1983 Claims Against Defendant Officers

### A.   Relevant Facts[2]

#### 1.   Dispatch to the Police Station Parking Lot

On April 28, 2019, at approximately 1:00 p.m., Defendant FPD Sergeant Jacobellis reported to the Flagstaff police station at 911 E. Sawmill Road in Flagstaff, Arizona after hearing a dispatch regarding a disturbance involving a man, later identified as Brandon, in the parking lot.  (Doc. 13 ¶ 13; Doc. 72 (Defs.' Statement of Facts) ¶ 1; Doc. 96 (Pl.'s Controverting Statement of Facts) ¶ 1.)  The reporting party, off-duty police officer Josiah Cade, reported that the man appeared to be 10-16—the radio code for a mentally challenged individual—or possibly high.  (Doc. 72 ¶ 2.)  Sgt. Jacobellis did not hear Officer Cade's call but heard parts of the dispatch and read the information from the dispatch log on his police vehicle monitor.  (*Id.* ¶ 3.)  He does not remember if he heard that the individual was possibly 10-16, and this information was not in the log notes he read, which stated, "male in main parking lot lsw gry tank top, whi capri pants pacing back and forth and yelling alone."  (*Id.* ¶ 4.)  The log notes designated the type of call as "suspicious person." (*Id.*)

. . . .

---

[2] The facts are drawn from both parties' statements of fact and underlying evidence, including deposition and police bodycam evidence.  For genuine disputes of material fact, the Court adopts Plaintiff's supported version of the facts.  *Anderson*, 477 U.S. at 255.  But where either party's facts are clearly contradicted by the video evidence, such that no reasonable jury could credit them, the Court has relied on the video evidence to set forth the relevant facts.  *See Scott*, 550 U.S. at 380 (on summary judgment, the Court is not required to adopt a version of the facts that is "blatantly contradicted by the record, so that no reasonable jury could believe it").

### 2.    Initial Contact in Police Station Parking Lot

Upon arrival at the police station, Sgt. Jacobellis observed Brandon in the front parking lot and exited his vehicle to ask Brandon if he needed police assistance.  (*Id.* ¶ 5.)  Brandon looked at Sgt. Jacobellis, then turned around and walked away.  (*Id.* ¶ 6.)  At the time, Sgt. Jacobellis did not know if Brandon had anything to do with the reported disturbance.  (*Id.* ¶ 7.)

Almost immediately, an unknown female, later identified as Plaintiff, approached Sgt. Jacobellis and asked if he was there because she had just called 9-1-1.  (Doc. 72-6, Ex. 17, Jacobellis bodycam I at 20:39:00.)[3]  Sgt. Jacobellis pointed towards Brandon, who was then walking on the other side of the parking lot, and asked, "what's he doing?"  (*Id.* at 20:39:17.)  Plaintiff explained that Brandon was her son and that "they just threw us out here"; she said she did not know where her van was, where her cat was, Brandon had "no medication.  I don't know where his medication is.  And they just threw us out together."  (*Id.* at 20:39:17−38.)  She emphasized that Brandon was "whacked" because "he hasn't had medication in . . . this is awful what they just did.  It's unbelievable this whole thing . . ." (*Id.* at 20:39:38−46.)  At the time, Defendant FPD Officer Sherf, who had also heard the radio dispatch, arrived on the scene.  (Doc. 72 ¶ 8.)

After talking to Plaintiff, Sgt. Jacobellis radioed that these were two jail releasees who were transplants from Ashfork, and the male "was just 10-16, upset for his arrest in Ashfork from CCSO; they both walked off."  (*Id.* ¶ 13; Doc. 96 ¶ 13.)  Sgt. Jacobellis also approached Officer Sherf, who was standing near his own patrol car, and informed him that Brandon was "apparently off his meds."  (Doc. 72 ¶ 14.)  Officer Sherf responded, "you think?" and both officers laughed.  (*Id.* ¶ 15; Jacobellis bodycam I at 20:39:38−46.)

Shortly after Brandon walked away from Sgt. Jacobellis, police aide Zachary Eastin observed Brandon walking northbound on the roadway of Sawmill Road, with traffic

---

[3] The video evidence includes footage from multiple police bodycams, which have been produced electronically in separate segments, each with differing durations.  For chronology and synchronization purposes, the Court will reference the time stamp on the upper right corner of the video segments, not the times on the playback counter.

repeatedly having to go around him, even entering the oncoming lane to avoid him. (Doc. 72 ¶¶ 16−17.)[4]   Eastin observed Brandon cross the double center line into the southbound lane and continue to walk for a couple seconds.  (*Id.* ¶ 18.)  Eastin engaged in the following radio exchange with Sgt. Jacobellis:

> Eastin: "That 10-16's in the middle of the roadway on Sawmill."
>
> Jacobellis: "He's in the roadway now?  Alright I'm coming to you."
>
> Eastin: "10-4.  He's comin' northbound.  He's off the roadway now."
>
> Jacobellis: "Ok, so we had an obstruction."
>
> Eastin: "He's walking in the roadway!"

(Doc. 96 ¶ 17(A); Doc. 72-1, p. 82, Ex. D, audio CD.)

### 3.   Brandon's Arrest

Based on the information from Eastin, Sgt. Jacobellis and Officer Sherf got in their separate patrol cars, exited the parking lot, and drove northbound on Sawmill Road in the direction Brandon had been seen walking.  (Doc. 72 ¶ 20.)  Calls involving pedestrians in the roadway are dispatched as "priority one," the highest priority for a response, because

---

[4] Plaintiff objects that what Eastin saw is irrelevant because reasonable suspicion or probable cause for arrest are based on what the arresting officer—in this case Sgt. Jacobellis—knew at the time of the arrest.  (Doc. 96 ¶ 17.)  Plaintiff does not offer any controverting facts but, instead, engages in arguments about which facts are relevant to her false arrest claim, which should be reserved for the memoranda of law, not the controverting statement of facts.  *See* LRCiv 56.1(a & b).  Plaintiff also claims to raise a credibility issue regarding Eastin's deposition testimony that he saw traffic having to swerve around Brandon because subsequent footage from Officer Sherf's body camera about 30 seconds later shows only one car driving on each side of the roadway.  (Doc. 96 ¶ 17.)  Although credibility determinations are reserved for the jury, Plaintiff relies solely on evidence that is not concurrent with and does not conflict with Eastin's first-hand testimony to try to cast doubt on what Eastin claims he saw; Plaintiff's conjecture is insufficient to create a genuine issue of material fact regarding Eastin's sworn statements.

in 2016−2017, FPD saw a significant increase in pedestrian-related collisions with some fatalities.  (*Id.* ¶ 21; Doc. 72-1, Ex. 1, Jacobellis Dep. at 51:15−52:8).[5]

    As Sgt. Jacobellis drove toward Brandon's location, he observed that Brandon was walking in the middle of the northbound lane, obstructing traffic, with two or three vehicles having to move to avoid striking him.  (*Id.* ¶ 23; Jacobellis Dep. at 27:23−28:13.)  While Officer Sherf was also enroute behind Sgt. Jacobellis, video from Officer Sherf's bodycam shows two or three cars driving in the opposite direction on the southbound side of the road without apparent obstruction and a yellow-green vehicle, which Officer Sherf identified in his deposition as a green Kia Soul, driving northbound directly in front of Sgt. Jacobellis. (Doc. 72, Ex. 18, Sherf bodycam at 20:42:52−43:02.)

    About the time Sgt. Jacobellis reached Brandon's location, Officer Sherf saw the Kia in front of Sgt. Jacobellis "swerve out" and cross the center line.  (Doc. 72 ¶ 24; Doc. 72-1, Ex. 3 (Sherf Dep.) at 128:5−25.)  On the bodycam video, the Kia is mostly blocked from view by Sgt. Jacobellis's patrol vehicle until Sgt. Jacobellis activates his police lights and pulls slightly to the shoulder of the roadway, at which point the Kia becomes visible in front of Sgt. Jacobellis's patrol car and simultaneously appears to swerve out, toward the center of the roadway, but the video is not clear enough to show

---

[5] Plaintiff claims to dispute these facts based on FPD Chief Dan Mussleman's deposition testimony regarding FPD's policies of using police codes 1, 2, and 3 to designate urgency, with "code 3" being the most urgent and requiring both lights and sirens, and his testimony that reports of an intoxicated person in the roadway always require a code 3 response.  (Doc. 96 ¶ 21.)  This testimony involves a different coding system from dispatch's numerical prioritization of calls, with priority one calls being the most urgent. Additionally, while Plaintiff relies on Chief Mussleman's statements that calls involving intoxicated individuals in the roadway always call for a "code 3" response, purportedly to show that a call involving a *non-intoxicated* person would not, Chief Mussleman was not asked to opine about the urgency or coding of calls involving non-intoxicated individuals in the roadway; nor does his testimony materially controvert that, when confronted with a pedestrian suspected of being "high" or mentally disabled impeding traffic, as the facts show here, FPD officers would treat this as a "priority one" response, just as they are required to do for any call involving a pedestrian in the roadway.  (Jacobellis Dep. at 51:15−52:8; Doc. 96-3, Mussleman Dep. at 22:3−24:4.)

whether it crosses the center line.  (Sherf bodycam at 20:43:02−5.)  The Kia then continues driving northbound, and Sgt. Jacobellis pulls back out, into the northbound lane, going around Brandon, who can then be seen for the first time on video walking along the shoulder of the road, first at an angle, facing ahead and outwards towards the side of the road, and then straight ahead, facing forward along the roadway.  (*Id.* at 20:43:05−08; Doc. 72 ¶ 28.) At the time, Brandon was walking towards Butler St., which is a heavily trafficked road with more lanes and higher rates of speed than Sawmill Road.  (Doc. 72 ¶ 25.)[6]

After Sgt. Jacobellis passed Brandon, he parked his patrol car in the roadway, partially over the white line of the bike lane, ahead of Brandon.  Brandon then turned toward the roadway and began walking into the road, around the back of the patrol car, and then in the direction of Sgt. Jacobellis, who had simultaneously emerged from the driver's side door of the vehicle near the center of the street and turned to face Brandon.  (Sherf bodycam at 20:43:10−14.)  Sgt. Jacobellis, who was in his black FPD uniform, observed that Brandon was not looking at him.  (Doc. 72 ¶ 32.)  He stepped toward Brandon with his gloved hands held up near his waist, palms forward, and Brandon began to walk

_____

[6] Plaintiff claims that the video contradicts Sgt. Jacobellis's and Officer Sherf's accounts that Brandon was walking in the roadway and that two to three vehicles, including the Kia, swerved to avoid hitting him.  (Doc. 96 ¶¶ 23−24.)  Officer Sherf's bodycam footage does not depict what was in Sgt. Jacobelllis's view ahead of Officer Sherf's vehicle and therefore does not materially controvert Sgt. Jacobellis's testimony about what he initially observed.  Further, when Sgt. Jacobellis closes in on Brandon's location, the video from Officer Sherf's vehicle is mostly blocked by Sgt. Jacobellis's vehicle and the Kia and does not materially contradict the officers' sworn testimony that Brandon was in the roadway impeding traffic or that the Kia swerved to avoid hitting him.  About 4−5 seconds after the Kia appears to swerve, the video shows Brandon walking at the side of the roadway, first at an angle, facing ahead and away from the street, and then facing forward along the roadway, when Sgt. Jacobellis pulls back out from the side of the road and passes him.  There is no clear view from the video of where Brandon was up to that point that would contradict that he was in the roadway.  Plaintiff also does not claim to have seen where Brandon was at the time Sgt. Jacobellis arrived or to have personal knowledge of whether any vehicles had to swerve to avoid hitting him that would create a genuine issue of material fact as to these officers' firsthand accounts of what they observed.

backwards, then stood on the yellow center line of the roadway with his head down and moving to the sides.  (Sherf bodycam at 20:43:14−12.)  Sgt. Jacobellis asked, "is your name Brandon?" to which Brandon did not answer, then said, "Brandon, we can't walk in the roadway," and Brandon quickly stepped to the right, then lunged forward and pushed Sgt. Jacobellis with both hands, which Sgt. Jacobellis blocked with his own hands, causing Sgt. Jacobellis to jump backwards.  (*Id.* at 20:43:19−28.)  This occurred approximately 13 seconds from when Sgt. Jacobellis initially got out of his patrol vehicle.  (Doc. 72 ¶ 39.)

Sgt. Jacobellis can be heard saying, "Yo, bro!" while Brandon is grabbed by Officer Sherf.  (*Id.* at 43:28−30.)  Sgt. Jacobellis's bodycam shows Officer Sherf run up behind Brandon while Brandon is moving backwards and grab Brandon from behind, wrapping his arms around Brandon's upper shoulders.  (Doc. 72, Ex. 19, Jacobellis bodycam II at 20:43:28.)  Officer Sherf then put Brandon in a bearhug and spins Brandon down to the ground.  (*Id.* at 20:43:28−31.) (Doc. 72 ¶ 40.)  The video shows Officer Sherf forcefully take Brandon's upper body to the ground on Brandon's side.  He is in a semi-sitting position with his legs out to his right.  Seconds later, Brandon can be seen with his knees bent under him on the pavement, with his head and upper body moving around in front of and under Officer Sherf's chest.  (Doc. 96 ¶ 40; Jacobellis bodycam II at 20:43:31, 34.)

Sgt. Jacobellis immediately assisted Officer Sherf with trying to gain control of Brandon on the ground.  (*Id.* ¶ 42.)  Due to the officers' rapid movements, both bodycam videos are too shaky for several seconds to tell anyone's precise actions, as a struggle ensues on the ground.  According to Sgt. Jacobellis, Brandon's knees were underneath him when he went down, and Officer Sherf "kind of wrapped him up"; then, when Sgt. Jacobellis came around Brandon's right side, Officer Sherf released Brandon from the controlled bearhug and Brandon's arms went directly in, toward the center of his chest. Sgt. Jacobellis tried to get hold of Brandon's wrist, but as he was attempting to do so, he perceived Brandon was biting his forearm, and he told Officer Sherf to call for another unit.  (Doc. 72-1, Ex. 1, Jacobellis Dep. at 53:4−54:11.)  On the video, a short time into the

1  struggle on the ground, Sgt. Jacobellis can be heard yelling, "don't bite me!  Ow!  God
2  dammit!"  (Sherf bodycam II at 20:43:30−51.)

3       Both he and Officer Sherf were struggling to place Brandon in handcuffs, and Sgt.
4  Jacobellis felt Brandon tuck himself further down and hunch over, causing Sgt. Jacobellis
5  to lose balance and fall onto his right knee.  (Doc. 72 ¶ 46.)  Plaintiff disputes this and
6  argues that the video shows Brandon was already being pushed forward in a "contorted
7  posture," making it impossible for him to hunch forward any further.  (Doc. 96 ¶ 46.)  On
8  the video, Brandon can be seen seated on the pavement with his left knee bent and his right
9  leg out to the side with both officers and police aide Eastin bending down behind his back.
10  (Sherf bodycam II at 20:43: 51−44:15.)

11       According to Sgt. Jacobellis, once on the ground, Brandon struggled and resisted
12  being placed in handcuffs.  (Doc. 72 ¶ 47.)  Eastin testified that he assisted the officers by
13  holding Brandon's feet because Brandon "was kicking" and Eastin wanted to make sure
14  Brandon "wouldn't kick Sergeant Jacobellis."  (*Id.* ¶ 48; Doc. 72-1, Ex. 5, Eastin Dep. at
15  245:17−246:6.)  Plaintiff disputes that Brandon was kicking, claiming that the video shows
16  that Brandon's right leg was immobile and stretched in a contorted position out to the side
17  when Eastin grabbed Brandon's ankle.  (Doc. 96 ¶ 48.)  The video shows that, just before
18  Sgt. Jacobellis yelled out, "don't bite me! Ow!" Brandon kicked out to the side with his
19  right leg as the officers were struggling with him on the ground, but his leg did not make
20  contact with either of the officers.  (Sherf bodycam at 20:43:38.)  About 7-8 seconds later,
21  Eastin can be seen to the right of Brandon, taking hold of Brandon's right foot, at which
22  time Brandon's right leg is no longer moving.  (*Id.* at 20:43:46.)

23       The video shows that Sgt. Jacobellis then placed his hands on the back and to the
24  side of Brandon's head and, about 15 seconds after first crying out "don't bite me! Ow!"
25  he again stated, "he's trying to bite me"; after this, Sgt. Jacobellis's left hand can briefly
26  be seen gripping the back of Brandon's head by the hair and pushing down multiple times
27  while one of the officers can be heard shouting, "Give up your hand! Give up your other
28  hand!  Stop resisting!"  (*Id.* at 20:43:50−44:17.)  Sgt. Jacobellis testified that, at this time,

he had "loose control" of Brandon's head via the hair while on the ground on his knees with Brandon, and, at the same time, he lost control of Brandon's right arm and felt Brandon "wrapping" his right arm around Sgt. Jacobellis's right leg.  (Doc. 72-1, Ex. 1, Jacobellis Dep. at 33:21−25, 56:18−57:2.)  Though unknown to Brandon, Sgt. Jacobellis carries a backup firearm in an ankle holster on his left ankle, and, at the time he saw Brandon wrap his right arm around his right leg, Sgt. Jacobellis had both knees close together.  (*Id.* at 57:7−23.)  He also saw Brandon "coming back towards me to bite me," and, pulling his hair, he struck Brandon's head on the pavement to avoid being bitten again or contacted further.  (*Id.* at 34:1−6.)[7]

According to Sgt. Jacobellis, the head strikes stunned Brandon and gave Sgt. Jacobellis enough time to gain control of his wrist, but Sgt. Jacobellis then quickly lost his hold again.  (Doc. 72 ¶ 62; Doc. 72-1, Ex. 1, Jacobellis Dep. at 59:15−60:5.)  When it appeared to Sgt. Jacobellis that Brandon was "coming back up," Sgt. Jacobellis used a fist strike on Brandon's cheek as his head was coming up from the ground.  (Jacobellis Dep. at

---

[7] Plaintiff repeatedly disputes parts of Sgt. Jacobellis's testimony, arguing that the video does not specifically show the movements Sgt. Jacobellis claims he saw or felt from Brandon at the time.  (Doc. 96 ¶¶ 53−55.)  But Sgt. Jacobellis's sworn testimony based on personal knowledge is admissible evidence, and unless Plaintiff cites to portions of the video that, construed in Plaintiff's favor, genuinely and materially conflict with Sgt. Jacobellis's testimony, the mere fact that not all of Sgt. Jacobellis's actions are observable on the bodycam video is insufficient to create a genuine issue of material fact regarding Sgt. Jacobellis's first-hand sworn testimony about what occurred especially when Plaintiff offers no issues of material fact sufficient to contest the scenario.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Scott*, 550 U.S. at 380 (quoting *Anderson*, 477 Us. at 247−48) (internal quotation marks omitted) (emphases in *Anderson*); Fed. Rule Civ. P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

.

60:4−7.)  This stunned Brandon long enough for Sgt. Jacobellis to regain control of Brandon's wrist, move the wrist to the small of Brandon's back, and with the help of Officer Sherf, apply handcuffs.  (*Id.* at 60:8−13; Jacobellis bodycam at 20:44:36; Doc. 96 ¶ 60A).  After the officers pulled Brandon's hands together behind his back, Sgt. Jacobellis can be heard saying "alright, we got one in custody."  (Jacobellis bodycam II at 20:44:55).  Both Sgt. Jacobellis and Officer Sherf were surprised at Brandon's strength during the encounter.  (Doc. 72 ¶ 64.)

About the same time Sgt. Jacobellis grabbed Brandon's head by the hair and began striking it into the pavement and one of the officers was shouting, "Give up your hand! Give up your other hand!  Stop resisting!" Plaintiff can be heard on Officer Sherf's bodycam, yelling off screen, "Brandon, chill out!  Brandon, chill out!"  (Jacobellis bodycam II at 20: 44:11.)  Plaintiff then comes into view, running from behind the officers to face Sgt. Jacobellis while yelling, but her words are drowned out by Sgt. Jacobellis shouting, "Back off!  Step back!" as he continues to lean down on top of Brandon.  (*Id.* at 20:41:17−44:19.)  Plaintiff continues to yell, "he is autistic and mentally ill," to which Sgt. Jacobellis yells back, "Well, he doesn't have to assault us.  We're just trying to talk to him."  (*Id.* at 20:41:19−44:27.)

Over the next several seconds, as the officers continue to struggle with Brandon, the video shows Plaintiff back up several feet and take a seat on the curb but continue to yell objections toward the officers, including "Yes, I know, he's strong, but throwing him out on the street? . . . You guys did this, not you, them!  I asked them not to."  (*Id.* at 20: 44:27−45:09.)  Plaintiff later explained in her deposition that by "them," she meant DPS and the jail, but "mostly probably DPS, though, because that's where it started."  (*Id.* at 20: 44:27−44:56; Doc. 72-1, Ex. 4, Pl. Dep. at 213:2−17.)  She also yelled, "I don't even know where his medications are," and "So what, are you going to put him back in jail now?" while the officers and Eastin continued to hold Brandon down.  (*Id.* at 20: 44:27−45:09.)  Another officer then arrived, and someone can be heard asking, "How's his head?" to

which someone can be heard saying, "we need medics." (*Id.* at 20: 45:09−45:11.) Sgt. Jacobellis then radioed for medics to respond. (Doc. 72 ¶ 76.)

During the next 20−30 seconds, Brandon remains still, lying face-down on the ground with Officer Sherf and Eastin holding his back and legs down (Ex. 19 at 20:45:38); then the officers and Eastin assist Brandon into a seated position, and while Brandon remains motionless on the pavement with his legs out in front of him, Sgt. Jacobellis walks over to Plaintiff and begins conversing with her at the side of the road. (Ex. 18 at 20: 45:41−46:21.) Plaintiff can be heard saying, "I'm suing you all," that she has lawyers and, "it's not you, I'm not mad at you, thank you for getting him," to which Sgt. Jacobellis responds, "so don't threaten me," then asks Plaintiff for her i.d. (Ex. 19 at 20:45:50−20:46:02.) Plaintiff produces her i.d., but continues to ask, "where's his medication?" and to exclaim, "they took it. They took all his medication!" (*Id.* at 20:46:02−13.)

After interacting with Plaintiff for about one minute, Sgt. Jacobellis returns to where Brandon is seated, being watched over by Eastin while Officer Sherf is opening the back door of his patrol car. Sgt Jacobellis says, "Hey Brandon? Can you be calm for a minute? My other officer and I are going to sit you in the back of the car, O.K.?" and Sgt. Jacobellis and Eastin help Brandon up by the arms and walk on either side of him to Officer Sherf's patrol car and place him in the back seat of the car. During this time, Brandon can be seen on Officer Sherf's bodycam video, walking quietly with his hands handcuffed together behind his back. (Sherf bodycam at 20: 47:00−47:21.)

### 4.    Medical Response

Shortly thereafter, emergency responders arrived, and Sgt. Jacobellis informed them that Brandon had just gotten out of jail, was autistic, was going back to jail, and that Sgt. Jacobellis had "pounded his head in the ground twice and punched him in the face" and "he's got a little bleeding in his mouth." (Doc. 72 ¶¶ 82−83; Jacobellis bodycam II at 20:55:15−28.) Plaintiff informed the paramedics of the medications Brandon was taking, that Brandon had not had any medications for more than 24 hours, and she did not know

where his medications were.  (Jacobellis bodycam II at 20:55:35−57:08.)  The paramedics observed Brandon inside Officer Sherf's patrol car and cleared him to be taken back to the jail.  (Doc. 72 ¶ 84.)

While the paramedics were examining Brandon, and Plaintiff was talking to them outside the patrol car, Sgt. Jacobellis had Eastin photograph Sgt. Jacobellis's arm and Officer Sherf's wrist, which Officer Sherf said was swollen.  (Jacobellis bodycam II at 21:00:38−21:01:40.)  According to Eastin's deposition testimony, Officer Sherf's wrist appeared swollen, and Sgt. Jacobellis had red marks on his forearm, consistent with being bitten.  (Doc. 72 ¶¶ 80−81; Doc. 72-2, Ex 7.)  Plaintiff disputes that the photographs show any skin discoloration or any marks consistent with being bitten.  (Doc. 96 ¶ 81.)

Plaintiff asked Sgt Jacobellis if the paramedics could take Brandon to the hospital, and Sgt. Jacobellis told her that Brandon would be taken back to jail on a felony, would be seen by the judge tomorrow, and would be evaluated by the jail nurse.  (Doc. 72 ¶ 84; Jacobellis bodycam II at 21:02:10−22.)  Plaintiff objected to this, stating that she and Brandon had already been at the jail since 6:00 p.m. the previous day and that "the nurse did nothing!"; she insisted that Brandon needed to go to the hospital.  (Jacobellis bodycam II at 21:02:22−34.)  After further discussion with the paramedics, Sgt. Jacobellis agreed to have Brandon taken to the hospital before being taken back to the jail.  (*Id.* at 21:02: 34−04:11.)

Brandon was taken to the Flagstaff Medical Center, and Officer Sherf briefed medical personnel about what had occurred.  (Doc. 72 ¶¶ 85−86.)  Upon examination, emergency room physician Dr. Lotz noted, "Head: Normocephalic, atraumatic.  No scalp abrasions hematomas or lacerations noted.  No evidence of trauma."  (*Id.* ¶ 88; Doc. 72-1 at 230.)  Dr. Lotz had a long discussion with Plaintiff, and he opined in his medical notes, "I believe the best and safest option is to restart patient's home medication.  Therefore, I ordered diazepam, Depakote and trazodone to be provided here."  (Doc. 72-1 at 230.)

Dr. Lotz called the jail nurse, who reported that the jail did not carry Valium (diazepam) or trazodone and would be unable to provide Brandon those medications, but

1    Brandon would be evaluated in the morning and could be provided Depakote.  (*Id.*)  Dr.

2    Lotz provided Plaintiff a 3-day prescription of Brandon's medications, and the plan was

3    for Plaintiff to give Brandon these medications the next morning after his expected release

4    from jail and during their intended trip home to Colorado.  (*Id.*)  Dr. Lotz assessed Brandon

5    with acute agitation, history of autism, history of dissociative identity disorder, and history

6    of schizophrenia, and discharged him into police custody.  (*Id.*)

7                            **5.      Charges Against Brandon**

8           While still at the scene of the arrest, Sgt. Jacobellis determined that Brandon should

9    be charged with obstruction of a public thoroughfare, resisting arrest, and aggravated

10   assault on a police officer, with Officer Sherf as the victim of the resisting arrest charge

11   and Sgt. Jacobellis the victim of the aggravated assault charge.  (Doc. 72 ¶ 91; Doc. 96

12   ¶ 91.)  FPD Detective Casey Rucker was subsequently assigned to investigate the incident,

13   and, following his investigation, Detective Rucker submitted a charging request form to

14   the Coconino County Attorney's Office (CCAO), detailing the parties involved and the

15   proposed charges against Brandon, and uploaded all reports and digital media, such as

16   photographs and bodycam footage.  (Doc. 72 ¶¶ 92, 94.)  Other than a single email to Sgt.

17   Jacobellis and Officer Sherf, informing them of this decision, Detective Rucker had no

18   communication with these officers.  (*Id.* ¶ 93.)

19          Upon receipt of Detective Rucker's charging request, CCAO Deputy County

20   Attorney (DCA) Paul Rubin confirmed that all reports, records, photos, and bodycam

21   evidence were received, whereupon CCAO prepared a criminal complaint for Detective

22   Rucker's signature.  (*Id.* ¶¶ 96−97.)  DCA Rubin filed all three charges against Brandon,

23   but during the prosecution, he emailed Sgt. Jacobellis and Officer Sherf to request their

24   opinions as victims regarding potentially dismissing the charges due to Brandon's mental

25   health status.  (*Id.* ¶¶ 98, 100.)  Brandon's public defender also sent correspondence to

26   DCA Rubin, outlining what she believed to be untrue statements in the reports and issues

27   with the officers' actions during the arrest, and requesting that the charges against Brandon

28   be dismissed due to Brandon's mental health issues.  (*Id.* ¶¶ 102−103.)

Officer Sherf responded to the email from DCA Rubin, stating he did not have a problem with Brandon "getting mental help in lieu of jail time." (Doc. 96 ¶ 100C.) Sgt. Jacobellis responded that he had just been served a notice of claim of a pending lawsuit based on alleged excessive use of force and preferred to discuss the incident via telephone and not have anything documented in an email. (*Id.* ¶ 100D.) Sometime after these email exchanges, DCA Rubin sent an email to Brandon's public defender, stating he would need more time to review Brandon's mental health records. (*Id.* ¶ 100G.)

On December 18, 2019, DCA Rubin sent a plea offer to Brandon's public defender, offering to dismiss the charges against Brandon for obstructing a public thoroughfare and aggravated assault in return for Brandon's guilty plea to resisting arrest, a class 6 felony. (*Id.* ¶ 100 H.) Additional correspondence between DCA Rubin and defense counsel resulted in a February 20, 2020 Rule 11 competency evaluation, after which, Rubin filed a Motion to Dismiss all charges against Brandon, stating, "the parties do not dispute the findings and conclusions of Dr. Linskey." (*Id.* ¶¶ 100 J−K; Doc. 72 ¶ 104.) In March 2020, the criminal court granted the Motion to Dismiss and dismissed the charges against Brandon without prejudice based on Dr. Linskey's Rule 11 competency evaluation. (Doc. 72 ¶ 104.)

## B.    Count One: Wrongful Arrest

### 1.    Legal Standard

To prevail on a Fourth Amendment false arrest claim, a plaintiff must be able to show that there was no probable cause for the arrest. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (citation omitted). Probable cause exists when an officer has reasonably trustworthy information of facts and circumstances that are sufficient to justify the belief that an offense has been or is being committed. *Stoot v. City of Everett*, 582 F.3d 910, 918 (9th Cir. 2009) (citing *Brinegar v. United States*, 338 U.S. 160, 175−76 (1949) (internal quotation marks omitted)). "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment

purposes. *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008). When determining whether probable cause exists, the Court looks to the totality of the circumstances known to the arresting officer at the time of the arrest. *Id.* (internal quotation marks and citation omitted). "In applying these standards, [the Court] must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest." *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975). Where any potential crime is supported by probable cause, the arrest is justified. *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 952 (9th Cir. 2003), *overruled on other grounds by Edgerly v. City & Cnty. of San Francisco,* 599 F.3d 946, 956 n. 14 (9th Cir.2010); *Barry v. Fowler*, 902 F.2d 770, 773, n.5 (9th Cir. 1990); *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008).

The Fourth Amendment also permits police officers to make brief, investigatory stops (*Terry* stops), even without probable cause for arrest, "if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266 (2002)) (internal quotation marks omitted); *Terry v. Ohio*, 392 U.S. 1 (1968). Reasonable suspicion requires more than "inchoate and unparticularized suspicion or [a] hunch"; the officer must have "some minimal level of objective justification" for making the stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks and citations omitted). This level of suspicion is "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.*; *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985) ("The 'reasonable suspicion' standard . . . effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause.") As with probable cause, reasonable suspicion is determined by reference to "the totality of the circumstances." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003). Thus, "[a]ll relevant factors must be considered in the reasonable suspicion calculus—even those factors that, in a

1    different context, might be entirely innocuous." *Id.*

2            **2.    Discussion**

3            Plaintiff concedes that, after Brandon pushed Sgt. Jacobellis, Defendant Officers

4    had probable cause to arrest Brandon for assault on an officer, and Plaintiff does not

5    challenge Brandon's arrest for aggravated assault.  (Doc. 72-6 at 51−52 (Pl. Resp. to Defs.

6    RFA, Nos. 6, 11).)  Instead, Plaintiff's false arrest claim is based on Sgt. Jacobellis's initial

7    13-second investigatory stop, when he stepped out of his patrol car in full police uniform

8    and held up his hands in front of Brandon and said, "Brandon, we can't walk in the

9    roadway."  (Sherf bodycam at 20:43:19−28.)

10           Defendants have produced sufficient evidence to show that this initial *Terry* stop

11   was supported by reasonable suspicion that Brandon was obstructing a thoroughfare in

12   violation of Arizona law.  Under Arizona Revised Statutes § 13-2906, a person commits

13   obstruction of a public thoroughfare if he "recklessly interferes with the passage of any

14   highway or public thoroughfare by creating an unreasonable inconvenience or hazard."

15   Ariz. Rev. Stat. § 13-2906(A)(1).

16           The undisputed evidence shows that, just before Sgt. Jacobellis drove to Brandon's

17   location, police aide Eastin reported to Sgt. Jacobellis over the radio, "that 10-16 is in the

18   middle of the roadway on Sawmill. . . . He's coming northbound.  He's off the roadway

19   now. . . . He's walking in the roadway!"  (Doc. 96 ¶ 17(A); Doc. 72-1, p. 82, Ex. D, audio

20   CD.)  Sgt. Jacobellis also testified that, as he drove toward Eastin's location, he observed

21   Brandon walking in the middle of the northbound lane, with vehicles having to swerve to

22   avoid hitting him.  (Doc. 72-1, Ex. 1, Jacobellis Dep. at 27:23−28:13.)  Taken together,

23   Eastin's first-hand report that Brandon was in the middle of Sawmill Road and was walking

24   in and out of the roadway, and Sgt. Jacobellis's own observation of Brandon walking in

25   the northbound lane, causing cars to have to swerve to avoid hitting him, are enough to

26   permit a reasonable officer in Sgt. Jacobellis's position to reasonably suspect that Brandon

27   was recklessly interfering with traffic and creating "an unreasonable inconvenience or

28   hazard."  *Id.*; *Stoot*, 582 F.3d at 918.

1     Plaintiff argues that the video from Officer Sherf's bodycam materially controverts

2  Sgt. Jacobellis's testimony that Brandon was walking in the roadway, blocking traffic, and

3  that, at a minimum, the video creates a disputed issue of fact whether Brandon was in the

4  roadway or had only briefly stepped into and back out of the roadway and was otherwise

5  merely walking alongside it.  (Doc. 95 at 9.)  Contrary to Plaintiff's assertions, the video

6  from Officer Sherf's bodycam is not concurrent in time or place with Eastin's radio

7  transmissions and does not materially conflict with Eastin's first-hand radio report that

8  Brandon was going in and out of the roadway or with Sgt. Jacobellis's subsequent

9  observation that Brandon was walking in the northbound lane, causing cars to have to go

10  around him.  These articulable facts about Brandon's movements are enough to give rise

11  to reasonable suspicion that Brandon was interfering with traffic on a public thoroughfare

12  and creating "an unreasonable inconvenience or hazard."  Ariz. Rev. Stat. § 13-2906(A)(1).

13  *See Bates ex rel. Johns v. Chesterfield Cty., Va.*, 216 F.3d 367, 371 (4th Cir. 2000) (officer

14  had reasonable suspicion to stop and "assess the situation" where a juvenile who had

15  trespassed onto private property was reportedly "acting weird or crazy" and had just run

16  into the woods).

17     Plaintiff also argues that, even if Brandon was walking in the roadway, the required

18  mens rea for violating § 13-2906 is recklessness, and Sgt. Jacobellis's knowledge that

19  Brandon was off his medications should be considered in assessing the reasonableness of

20  believing that Brandon was being reckless.  (Doc. 95 at 9, 12.)  Although lack of the

21  required mens rea to commit an offense may be a defense to criminal charges, Sgt.

22  Jacobellis was not required to have "proof of wrongdoing by a preponderance of the

23  evidence," before making a brief, investigatory stop.  *Sokolow*, 490 U.S. 7.  Moreover,

24  even in the more demanding probable cause context, the Ninth Circuit has acknowledged

25  that, while "lack of mens rea by reason of [an arrestee's epileptic] seizure could be a

26  defense to criminal liability, '[i]t is not the rule that police must investigate a defendant's

27  legal defenses prior to making an arrest.'"  *O'Doan v. Sanford*, 991 F.3d 1027, 1040 (9th

28  Cir. 2021) (quoting *Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009).)  In *O'Doan*, the court

reasoned that "[i]f arresting officers had to accept at face value claims of potential lack of mens rea . . .  many arrests for unlawful conduct would likely be called into question, with significant public safety consequences," and it concluded that "no clearly established law required the officers to credit O'Fria and O'Doan's explanation and deem true a possible defense, namely, that O'Doan lacked the wherewithal to be responsible for unlawful conduct." *Id.* at 1041, 1043.  So too, here, a reasonable officer under the totality of the circumstances confronting Sgt. Jacobellis at the time could have reasonably suspected that Brandon was violating § 13-2906(A)(1), and Sgt. Jacobellis was not required to assess Brandon's mens rea before initiating a brief, investigatory stop.

In the alternative, to the extent Brandon's unmedicated mental conditions kept him from having the required mens rea to commit a crime, Sgt. Jacobellis was entitled to stop and temporarily detain Brandon, even without a warrant or probable cause, based on exigent circumstances—what Defendants refer to here as his "community caretaking duties." (Doc. 87 at 11−12.)  The Supreme Court has held that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency") (internal quotation marks and citations omitted)); *see also United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993) ("a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.")

It is undisputed that the FPD had, in recent years, seen a large increase in pedestrian-related traffic accidents, some involving fatalities, causing it to give top priority to calls involving pedestrians in the roadway.  Here, police aide Eastin reported to Sgt. Jacobellis that Brandon was walking in and out of the roadway on Sawmill Road, which, under FPD policy, called for a "priority one" response due to the risk of Brandon causing a pedestrian-

related traffic accident and the potential threat of serious harm that could result to himself or others.  Additionally, when Sgt. Jacobellis encountered him, Brandon was walking in the direction of Butler Ave., a more heavily trafficked road where the risk of a pedestrian-related traffic accident would have become much greater had Brandon been permitted to continue walking and potentially enter a busier street.

Plaintiff argues that Defendants have presented no evidence that Sgt. Jacobellis stopped Brandon because he believed Brandon posed a danger to himself or others. (Doc. 95 at 11.)  Plaintiff speculates, instead, that Sgt. Jacobellis did so only to get a "hat trick" of charges against Brandon, not because Brandon was in danger. (*Id.*)  But for Fourth Amendment purposes, the Court must look to whether Sgt. Jacobellis's actions were objectively reasonable, not to his subjective intent. *John*, 515 F.3d at 940.  Under the facts known to Sgt. Jacobellis when he stopped Brandon on Sawmill Road, it was objectively reasonable for a police officer to do so for the protection of Brandon and the public.

There is no genuine dispute that a pedestrian walking in the roadway, or one intermittently walking in and out of the roadway—particularly one who  officers have reason to believe to be mentally impaired at the time—presents a danger to himself and others. *See Martin*, 509 F.2d at 1213 (The Court "must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest.")  Thus, even without probable cause to arrest Brandon for a crime, a reasonable officer in Sgt. Jacobellis's position would have been justified in stopping and briefly detaining Brandon for his own protection and that of the community.  The Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's false arrest claim in Count One and will dismiss this claim with prejudice.

### C.     Count Two: Excessive Use of Force

#### 1.     Legal Standard

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature

and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537. "[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396−97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8. But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689,

701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

### 2.    Discussion

As noted, to determine whether a Fourth Amendment violation occurred, the Court must first assess the nature of the force inflicted.  Here, Defendant Officers' use of physical force principally consisted of (1) Officer Sherf's initial bearhug and take-down of Brandon and (2) the multiple instance in which Sgt. Jacobellis pushed Brandon's head into the pavement and the single punch to Brandon's cheek.

Respecting Officer Sherf's initial takedown, Sgt. Jacobellis's bodycam video shows that, after Brandon lunged forward and pushed Sgt. Jacobellis backwards, Officer Sherf came from behind Brandon and wrapped his arms around Brandon's upper body, then spun Brandon around and slammed his upper body to the ground while maintaining his hold on him.  (Jacobellis bodycam II at 20:43:28−31.)  Construing the video evidence in Plaintiff's favor, Officer Sherf forcefully slammed Brandon onto the pavement.  This use of force is similar to a "reverse reap throw," a takedown maneuver that involves tripping and guiding a subject to the ground.  *See O'Doan*, 991 F.3d at 1033 (describing a reverse reap throw); *Bauer v. City of Pleasanton*, No. 19-CV-04593-LB, 2021 WL 2224016, at *13 (N.D. Cal. June 2, 2021) (same).  A reasonable jury could conclude from this evidence that Officer Sherf's actions constituted modest to intermediate force.  *O'Doan*, 991 F.3d at 1037 (describing a reverse reap throw as a "modest deployment of force"); *cf. Carr v. Cty. of San Diego*, No. 19-CV-1139 JLS (MDD), 2021 WL 4244596, at *13 (S.D. Cal. Sept. 17, 2021) ("putting Plaintiff into a headlock, slamming him to the ground, and then having multiple officers put their bodyweight on him would appear to be at least an intermediate

use of force.")

Regarding Sgt. Jacobellis's multiple head strikes and punch to the side of Brandon's face, impact blows by punching or kicking are generally considered intermediate force. *Steinmeier v. Cty. of San Diego*, No. 18CV1603 JM (WVG), 2020 WL 377052, at *6 (S.D. Cal. Jan. 23, 2020) ("punching, kicking, and/or hitting with a flashlight are intermediate levels of force that significantly intrude on Fourth Amendment rights").  Head strikes can become deadly force in some circumstances if "employed in a manner that creates a substantial risk of death or serious bodily injury." *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016) (internal citation omitted) (baton blows to the head equate to deadly force).  Although it is the amount of force, not the amount of injury, that matters in the use-of-force context, courts may consider "the severity of injuries in evaluating the amount of force used." *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018); *see Sheridan v. Trickey*, No. CIV. 10-06034-AC, 2010 WL 5812678, at *5 (D. Or. Dec. 16, 2010), *report and recommendation adopted,* No. CV 10-6034-AC, 2011 WL 588769 (D. Or. Feb. 10, 2011) (slamming subject's head against the asphalt with sufficient force to knock him unconscious and fracture his face is at least intermediate, non-deadly force).  Conversely, the absence of injuries "can suggest a lesser degree of force when that force is of the type likely to cause injuries." *Id.*

The video evidence shows that Sgt. Jacobellis grabbed Brandon by the hair on the back of his head and pushed or slammed Brandon's head into the pavement several times. Sgt. Jacobellis also testified that this momentarily stunned Brandon, and he then stunned Brandon again with a closed fist blow to his cheek.  These head strikes and punch constitute at least moderate to intermediate force.  There is no evidence, however, from which a reasonable jury could find that Sgt. Jacobellis delivered this force in a manner that created "substantial risk of death or serious bodily injury" such that, as Plaintiff argues, he employed deadly force. (*See* Doc. 95 at 15−17.)  As the videotape and subsequent medical assessment reveal, however, the quantum of force Sgt. Jacobellis used was also less than that used by the defendant officers in *Davis v. City of Las Vegas*, in which the Ninth Circuit

opined that "forcefully slamm[ing an arrestee] head-first against a wall, . . . sw[i]ng[ing] him into another wall, also head-first, thereby breaking his neck, . . . . plac[ing a] knee on his back, . . . and punch[ing] him in the face" constituted an "extremely severe" use of force. 478 F.3d 1048, 1055 (9th Cir. 2007). Unlike in *Davis*, there is no evidence that Brandon suffered any broken bones or head or neck injuries from Sgt. Jacobellis's head strikes and punch. Instead, the evidence shows that, shortly after the incident, the paramedics cleared Brandon for transport, and the emergency room doctor who subsequently examined Brandon found no evidence of head trauma, scalp abrasions, hematomas, or lacerations. (Doc. 72-1 at 230.) This lack of any notable injury is relevant to assessing the amount of force used. *Felarca*, 891 F.3d at 817. Viewing all the evidence in a light most favorable to Plaintiff, Sgt. Jacobellis's multiple head blows and punch to the face constituted modest to intermediate, non-deadly force. *See, e.g.*, *Steinmeier*, No. 18CV1603 JM (WVG), 2020 WL 377052, at *6; *Sheridan*, No. CIV. 10-06034-AC, 2010 WL 5812678, at *5.

Whether a modest to intermediate level of force was justified by either Defendant officer depends on the government interests at stake at the time of their respective uses of force, which requires analyzing the severity of Brandon's suspected crimes, the threat posed by Brandon at the time, and whether Brandon was resisting arrest. *Graham*, 490 U.S. at 396−97.

As to the severity of his suspected crimes, Brandon was initially suspected only of obstructing a public roadway, a non-violent, misdemeanor offense under Arizona law. Ariz. Rev. Stat. Ann. § 13-2906. Nonetheless, it is undisputed that calls of a pedestrian in the roadway require an urgent, "priority 1" police response. Further, based on the facts known to Defendant Officers at the time, Brandon was suffering from serious mental disorders compounded by a prolonged period off his medication, had been unresponsive and walked off when Sgt. Jacobellis first tried to speak to him in the police station parking lot, had shortly thereafter been observed walking in and out of Sawmill Road, and when Sgt. Jacobellis confronted him, was walking in the direction of Butler Avenue, a more

heavily trafficked road.  Taken together, these facts indicate a high government interest at stake in stopping and detaining Brandon for his own safety and that of the community.  In addition to obstruction of a public roadway, Brandon's sudden shove of Sgt. Jacobellis increased the severity and unpredictability of the situation and added to the government interest at stake in taking immediate control of Brandon to prevent him from engaging in further attacks and/or fleeing further down the roadway.

The evidence also supports that Brandon was posing a modest to moderate threat of harm to the officers when he abruptly pushed Sgt. Jacobellis backwards without knocking him down, then later bit Sgt. Jacobellis's arm, causing Sgt. Jacobellis to yell out. (Sherf bodycam at 20:43:30−51.)  *See Black v. Simmons*, No. CIV-19-101-KEW, 2020 WL 5834789, at *7 ("It is clear from the officer body camera videos that Officer Simmons believed Plaintiff was biting him.")  These actions likewise show that Brandon was resisting arrest, which further adds to the government interest at stake.  Taken together, Brandon's obstruction of a roadway, the threat he posed to himself and others, and his sudden shove of Sgt. Jacobellis support at least an intermediate to high government interest at stake in Defendant officers taking control of Brandon.

The remaining question is whether Defendant officers' uses of force were greater than reasonable under the circumstances.  *Espinosa*, 598 F.3d at 537.

### a.    Takedown

With respect to Officer Sherf's initial takedown of Brandon, Defendants argue that it was objectively reasonable for Officer Sherf to grab Brandon from behind and forcefully take him to the ground to attempt to gain control of him, stop any further assault, and take him into custody to prevent potential harm to himself or the community.  (Doc. 87 at 15.)

Defendants rely, in part, on the Ninth Circuit's opinion in *O'Doan*.  In *O'Doan*, officers were called to a "code 3" situation in which O'Doan, who was reportedly having a grand mal seizure, was naked and moving rapidly on a busy street and repeatedly resisted the officers' commands to stop, then turned on the officers in a threatening manner with fists clenched.  991 F.3d at 1037.  The Ninth Circuit found that a defendant officer's use

of a reverse reap maneuver to bring O'Doan to the ground was not excessive because it was not clear that any "less intrusive alternatives would have sufficed to bring O'Doan under control, especially when O'Doan had refused to heed several warnings to stop." *Id.* (internal quotation marks omitted); *see also Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (officer does not violate any clearly established right "when he progressively increases his use of force from verbal commands, to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders . . . in a challenging environment").

Plaintiff argues that Officer Sherf's forceful takedown was unreasonable because Brandon was not attempting to harm Sgt. Jacobellis but was merely trying to create space for himself because he felt scared and confused. (Doc. 95 at 14.) She further argues that it is a jury question whether this use of force was reasonable because, when he pushed Sgt. Jacobellis, Brandon did not injure him or knock him down, was unarmed, was not posing a serious threat to the officers, and was not attempting to flee. (*Id.* at 15.)

In the excessive-use-of-force context, however, "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. Brandon's intentions and mental state do not change the fundamental Fourth Amendment analysis, which requires considering what a reasonable officer would do under the totality of circumstances confronting him or her at the time. Here, a reasonable officer observing Brandon's actions and knowing that Brandon was mentally ill and had been involuntarily deprived of his medications could have reasonably believed that Brandon would again try to attack Sgt. Jacobellis or flee further down the roadway toward heavier traffic, thus justifying an immediate use of force to contain him.

*Larkin v. Kenison*, 475 F. Supp. 3d 1124, 1129 (D. Haw. 2020), which Plaintiff cites to show that Officer Sherf's takedown was excessive, while similar in context, presents very different facts regarding the need for force and the amount of force used. In *Larkin*, an officer responded to a call from a mother that her 25-year-old autistic son, Charles, was suffering from lack of sleep and paranoia and, when she tried to take him to the emergency

room, had run away.  *Id.*  When the mother and officer followed Charles and called out to him to try to stop him, Charles was unresponsive to verbal commands and continued to run.  *Id.*  He had just safely crossed a street with no traffic when the officer caught up to him on the sidewalk, grabbed him in a bearhug so that he had complete control of him, then executed an uncondoned front leg-sweep, for which he had not been trained, causing Charles to hit the concrete headfirst and to bleed profusely from his forehead, cheek, and lip, requiring him to need urgent, critical care.  *Id.* at 1129−30, 1137−38.  At the time of the incident, Charles was 5′10″ and weighed 114 pounds, and the officer was 6′1″ and weighed 395 pounds.  *Id.* at 1137.  Crediting Plaintiff's supported version of the facts, the court concluded that "no reasonable officer would believe that he or she could proceed with a forceful leg sweep likely to result in Charles' head breaking his fall where Charles was already rendered helpless and subdued by Officer Kenison's bear hug."  *Id.* at 1145.

Here, unlike in *Larkin*, the size difference between Brandon and Officer Sherf is not sufficiently extreme to suggest that grabbing Brandon in a bearhug rendered him completely helpless and subdued, and both Defendant Officers and Plaintiff later described Brandon as strong.  More significantly, Brandon was still in the street and had just lunged forward and shoved Sgt. Jacobellis, posing an objectively reasonable threat that he would continue to resist the officers or try to flee.  There is also no evidence, as in *Larkin*, that Officer Sherf improperly executed an unauthorized takedown maneuver, hit Brandon's head directly on concrete, causing serious head injuries, or used any more force than reasonably necessary to take immediate control of Brandon.  Instead, the video evidence shows that Officer Sherf took Brandon onto the pavement on his side while maintaining control of Brandon's upper body.  Under the circumstances confronting the officers at the time, the amount of force Officer Sherf used to take Brandon to the ground was objectively reasonable in relation to the need for force to subdue and take control of a resisting subject. *Garcia v. City of Santa Clara*, 772 F. App'x 470, 472 (9th Cir. 2019) (unreported) ("The relatively mild force that was used by law enforcement, which included a leg sweep, control holds, and a punch to the face, was reasonable" to control an arrestee "who

1   attempted to punch and kick the officers while the officers were trying to subdue him.").

2       Plaintiff also argues that Officer Sherf acted unreasonably because Defendant

3   officers were aware that Plaintiff, Brandon's mother, was only a few hundred yards away,

4   and they could have simply waited for her to arrive while attempting to communicate with

5   Brandon. (Doc. 95 at 15.) Even though the availability of less intrusive alternatives is a

6   relevant factor to consider in the use-of-force context, *Rice v. Morehouse*, 989 F.3d 1112,

7   1122 (9th Cir. 2021), it is undisputed that Sgt. Jacobellis had already addressed Brandon

8   calmly by name and tried, without success, to talk to him and let him know he could not

9   walk in the roadway. Further, there is no evidence Defendant officers were aware of

10  Plaintiff's current location or, even if they were, that they had any cause to reasonably

11  believe Plaintiff would be able to immediately calm Brandon down and prevent him from

12  attempting to fight or flee. During Sgt. Jacobellis's prior interaction with Plaintiff at the

13  police station, Plaintiff explained that Brandon was off his medications, the two of them

14  had just been thrown out into the parking lot without their belongings or any way to get

15  home, and Brandon was "whacked" after being deprived of his medications since their

16  arrests the previous night. Even if a reasonable officer could have inferred that, under these

17  circumstances, Plaintiff might have some way to help calm Brandon and could have

18  potentially convinced him to exit the roadway without force, police officers are not

19  required to avail themselves of the least amount of force available in a rapidly evolving

20  situation. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find

21  and choose the least intrusive alternative would require them to exercise superhuman

22  judgment. . . . [and] would inevitably induce tentativeness by officers, and thus deter police

23  from protecting the public and themselves. . . . [when acting] under stress and subject to

24  the exigencies of the moment.").

25      This analysis does not change solely because a subject is mentally ill. While

26  consideration of a subject's mental state is a factor to consider in the use-of-force analysis,

27  officers are not required to abstain from using reasonable force to take control of someone

28  posing a threat to himself or others, simply because the subject is mentally ill. The Ninth

Circuit has recognized that "the tactics to be employed against an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle v. Rutherford*, 272 F.3d 1272, 1283−84 (9th Cir. 2001).   Accordingly, "[i]n the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." *Id.* at 1284. But there is no "per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals."  Courts must still make allowances for an officer's need to make "split-second judgments" in "tense, uncertain, and rapidly evolving" circumstances. *Id.* (quoting *Graham,* 490 U.S. at 396–97).

Under the circumstances confronting Defendant officers at the time, in which Brandon was walking in a public street, had shown himself to be unresponsive to verbal cues, and had just lunged forward and shoved Sgt. Jacobellis, Officer Sherf's modest to intermediate use of force to take Brandon down to the ground without causing cuts or scrapes or any discernable injuries was objectively reasonable.   The Court will grant summary judgment to Defendants as to this use of force.

### b.    Head Strikes

Defendants argue that Sgt. Jacobellis's head strikes were objectively reasonable under the circumstances because, after Officer Sherf took Brandon to the ground, Brandon struggled with the officers for a full minute before they were able to pull his hands behind his back and handcuff him, and during that time, he bit and continued to try to bite the officers.  (Doc. 87 at 16−17.)  They argue that Sgt. Jacobellis only employed the head strikes when Brandon continued to resist giving the officers his hands and attempted to bite Sgt. Jacobellis a second time; then, Sgt. Jacobellis used only the amount of force reasonably necessary to handcuff Brandon and then ceased to use any further force.  (*Id.* at 17.)

As previously noted, Defendants have produced sufficient evidence to show at least an intermediate government interest at stake in arresting and taking control of Brandon at

the time of his arrest on the ground, and Sgt. Jacobellis's multiple head strikes and punch, causing no abrasions or notable injuries, consisted of modest to intermediate, non-deadly force.  It is also undisputed that, as soon as the officers had control of Brandon and had placed him in handcuffs, they used no further force on him.  Instead, Sgt. Jacobellis walked away to talk to Plaintiff, and Officer Sherf and police aide Eastin held Brandon down by placing their hands on his back and legs for 20−30 more seconds, then raised him to a seated position.  Making allowances for the officers' need to act quickly under a rapidly evolving situation, Defendants have shown that this use of force was reasonably balanced against the intermediate to high government interest at stake at the time and was not "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

Plaintiff argues that a reasonable jury could find that Sgt. Jacobellis's multiple head strikes and punch were excessive in relation to the need for force because Brandon was only engaged in "passive resistance," which justifies the use of only minimal force. (Doc. 95 at 18.)  Plaintiff further argues that, even if a reasonable jury could find that Brandon attempted to bite Sgt. Jacobellis, Sgt. Jacobellis could have moved his arm out of the way to protect himself.  (*Id.* at 19.)   And she argues that Sgt. Jacobellis "beat [Brandon's] head into the pavement so that he could get [Brandon's] arm out from under him and put him in handcuffs—not because he had an objectively reasonable fear for his safety." (*Id.*)

Plaintiff fails to create a genuine issue of material fact that Brandon was only passively resisting arrest, calling for only minimal force.  Plaintiff does not genuinely dispute that, once on the ground, Brandon pulled his arms into his chest, and when Sgt. Jacobellis attempted to get hold of Brandon's wrist to handcuff him, he "felt as if somebody was biting his forearm" and immediately asked for backup.  (Doc. 72-1, Ex. 1, Jacobellis Dep. at 53:4−54:11.)  On the video, Sgt. Jacobellis can be heard yelling, "don't bite me! Ow!  God dammit!"  (Sherf bodycam at 20:43:30−51.)  About 15 seconds later, while still struggling to pull Brandon's hands free, Sgt. Jacobellis again stated, "he's trying to bite me," and one of the officers can then be heard yelling, "Give up your hand!  Give up your

other hand!  Stop resisting!" (*Id.* at 20:43:46−44:17.)  Sgt. Jacobellis also testified that he was able to grab, but again lost control, of Brandon's right arm, then felt Brandon "wrapping" that arm around Sgt. Jacobellis's right leg and saw Brandon "coming back towards me to bite me," prompting Sgt. Jacobellis to deliver a closed fist punch to Brandon's cheek.  (Doc. 72-1, Ex. 1, Jacobellis Dep. at 33:21−34:6.)

Even though many of Brandon's and Defendant officers' movements on the ground are blocked from view or hard to make out from the video evidence, the video does not materially controvert that Brandon refused commands to give up his arms and bit and again attempted to bite Sgt. Jacobellis.  Police aide Eastin also testified that, after the officers' struggle with Brandon on the ground, he saw red marks consistent with bite marks on Sgt. Jacobellis's forearm—facts that are not plainly obvious but are visible upon enlarging the photograph Eastin took of Sgt. Jacobellis's forearm on the scene.  (Doc. 72 ¶¶ 80−81; Doc. 72-2 at 4.)  Plaintiff fails to point to any evidence that materially controverts these facts or Sgt. Jacobellis's sworn testimony that Brandon was actively resisting being placed in handcuffs, including by biting, wrapping his arm around Sgt. Jacobellis's leg, and again attempting to bite Sgt. Jacobellis's arm.  Sgt. Jacobellis's moderate to intermediate use of force to temporarily stun Brandon until the officers could secure him in handcuffs was objectively reasonable under the circumstances and lasted no longer than was reasonably necessary to take control of Brandon.

Plaintiff's additional argument that Sgt. Jacobellis could have simply pulled his arm away to protect himself if he felt concerned for his own safety ignores the evidence demonstrating at least an intermediate government interest in arresting Brandon, including that Brandon had, by then, physically charged into a police officer, giving the officers probable cause to arrest him for aggravated assault.  Additionally, whether Sgt. Jacobellis's subjective intent in employing head strikes to stun Brandon was to protect himself from bites or other physical harm or was to "get [Brandon's] arm out from under him and put him in handcuffs," as Plaintiff argues, is immaterial.  Both are legitimate government interests.  Moreover, the operative question for Fourth Amendment purposes is not one of

subjective intent, but whether the officer's actions were objectively reasonable under the totality of the circumstances known to the officer at the time.  Head strikes, while generally considered moderate force, can become an extreme use of force, capable in some instances of causing serious injury or death.  *Steinmeier*, No. 18CV1603 JM (WVG), 2020 WL 377052, at *6; *Garlick*, 167 F. Supp. 3d at 1147.  Here, however, , the separate videotapes do not suggest the use of deadly force, and there is no evidence that the head strikes Sgt. Jacobellis employed to temporarily stun Brandon without any notable abrasions or head injury were particularly extreme.  Construing in Plaintiff's favor that Sgt. Jacobellis employed at least intermediate, non-deadly force, this use of force was also not objectively unreasonable in light of the at least intermediate government interests at stake in subduing and taking control of Brandon at the time.  The Court will grant summary judgment to Defendants as to this use of force.

### D.   Count Three: Malicious Prosecution

#### 1.   Legal Standard

To prevail on a malicious prosecution claim, a plaintiff must show "that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995), *as amended on denial of reh'g and reh'g en banc* (Dec. 29, 1995).

Under some circumstances, a plaintiff may bring a malicious prosecution claim against a police officer based on the officer's actions during an investigation that led to a false prosecution.  *See, e.g.*, *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009) ("a § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (a plaintiff may state a § 1983 claim against officers who "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct . . . causing

the initiation of legal proceedings."); *Tatum v. Moody¸* 768 F.3d 806, 820 (9th Cir. 2014) (a plaintiff can state a due process claim against an officer where a detention is "of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks").

Where a prosecutor files criminal charges against the accused, police officers are generally immune to suits for damages resulting from a subsequent prosecution because "it is presumed that the prosecutor filing the complaint exercised independent judgment" in finding that the charges are supported by probable cause; therefore, "[t]he plaintiff bears the burden of producing evidence to rebut such presumption." *Newman v. Cnty. of Orange*, 457 F.3d 991, 993 (9th Cir. 2006).

### 2.   Discussion

It is undisputed that Detective Rucker, not Defendant Officers, investigated Brandon's suspected criminal actions at the time of his arrest and submitted a charging request to the CCAO, following which, DCA Rubin prepared a criminal complaint, charging Brandon with obstruction of a public thoroughfare, resisting arrest, and aggravated assault on a police officer.  (Doc. 72 ¶¶ 92−94.)  Apart from their arrest of Brandon, which Plaintiff acknowledges was based on probable cause, there is no evidence Defendant Officers had any involvement in the decision to prosecute Brandon.  Nor is there any evidence that Defendant Officers knowingly provided misinformation or concealed exculpatory evidence from Detective Rucker or DCA Rubin or otherwise engaged in wrongful or bad faith conduct that led to the decision to charge Brandon.

Plaintiff's malicious prosecution claim therefore arises, if at all, from Defendant Officers' alleged communications to DCA Rubin when Rubin emailed them during the prosecution to solicit their opinions regarding potentially dismissing the charges against Brandon due to his mental health status.  The evidence shows that Officer Sherf did not oppose providing Brandon "mental help in lieu of jail time" but also did not explicitly agree

to dropping the criminal charges against Brandon.  (Doc. 96 ¶ 100C.)  Sgt. Jacobellis, who had just received notice that he was being sued in connection with Brandon's arrest, did not want to document his response in an email and requested to speak to DCA Rubin by phone.  (*Id.* ¶ 100D.)  Sometime thereafter, DCA Rubin emailed Brandon's public defender, who had requested dismissal of the charges based on Brandon's mental health issues, and DCA Rubin stated that he would need more time to review Brandon's mental health records.  (Doc. 72 ¶¶ 102−103.)

Construing these facts in Plaintiff's favor, both Defendant Officers expressed opposition to dropping the charges against Brandon, causing DCA Rubin to seek more time to review Brandon's mental health issues.  DCA Rubin subsequently offered to dismiss the charges of obstructing a roadway and aggravated assault in exchange for a guilty plea to resisting arrest but later agreed to drop all charges based on the results of Brandon's Rule 11 competency evaluation.  (*Id.* ¶ 104; Doc. 96 ¶¶ 100H, J−K.)

These facts do not show that Defendant Officers improperly exerted pressure on DCA Rubin to prosecute Brandon.  *Awabdy*, 368 F.3d at 1067.  At most, a reasonable jury could infer that Defendant Officers told DCA Rubin they were opposed to him dropping the charges he had filed against Brandon based on Brandon's mental health status, prompting DCA Rubin to seek more time to evaluate Brandon's mental health records.  But there is no evidence that Defendant Officers had any contact with DCA Rubin prior to his deciding to file criminal charges against Brandon in the first instance or that they overrode DCA Rubin's independent judgment when Rubin chose to further evaluate Brandon's mental health records before proposing a plea deal or to await the results of a Rule 11 competency hearing before agreeing to dismiss all the charges.  Absent any such evidence, Plaintiff cannot rebut the presumption that police officers are immune from damages based on false prosecution when a prosecutor makes an independent judgment to press charges.  *Newman*, 457 F.3d at 993 ("We have long recognized that '[f]iling a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in

1    determining that probable cause for an accused's arrest exists at that time.'") (quoting

2    *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981)); *see Beck v. City of Upland*, 527 F.3d

3    853, 862 (9th Cir. 2008) (recognizing that this presumption "may be rebutted if the plaintiff

4    shows that the independence of the prosecutor's judgment has been compromised.")

5         For the above reasons, Plaintiff's false prosecution claim against Defendant Officers

6    fails as a matter of law, and the Court will dismiss this claim with prejudice.[8]

7    **IV.**    **Section 1983 Claims Against the City**

8        **A.**    **Count Four: *Monell* Claim for Failure to Train and Supervise**

9         Under 42 U.S.C. § 1983 there is no *Monell* claim against a municipality for failure

10   to train or supervise where there is no underlying deprivation of federal rights.  *See City of*

11   *Los Angeles v. Heller,* 475 U.S. 796, 799 (1986); *see also Monell v. Dep't of Soc. Servs.,* 436

12   U.S. 658, 691 (1978).  Because there is no underlying deprivation of a federal right by the

13   officers involved, there is no *Monell* claim against the City for failure to train or failure to

14   supervise.

15        Even had there been such an injury a municipality may not be sued under § 1983

16   solely because an injury was inflicted by one of its employees or agents.  *Long v. Cnty. of*

17   *Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  Rather, the municipality is liable only

18   when the execution of its policy or custom inflicts the constitutional injury.  *Id.*; *see also*

19   *Miranda v. City of Cornelius*, 429 F.3d 858, 868 (9th Cir. 2005); *Leatherman v. Tarrant*

20   *Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993); *Monell v.*

21   *New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of

22   _____

23       [8] Defendants also argue, in the alternative, that Defendant Officers are entitled to

24   qualified immunity as to all of the § 1983 claims against them because their actions did not
     violate any clearly established rights of which a reasonable officer would have known.

25   (Doc. 87 at 21−24.)  Because the Court finds that Defendant Officers are entitled to
     summary judgment on the merits, it need not address these arguments.  *Pearson v.*

26   *Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either the

27   constitutional violation or the "firmly established" prong first depending on the
     circumstances in the particular case).

28

1    a government's policy or custom, whether made by its lawmakers or by those whose edicts

2    or acts may fairly be said to represent official policy, inflicts the injury that the government

3    as an entity is responsible under § 1983").  To impose municipal liability under § 1983 a

4    plaintiff must show that (1) he or she was deprived of a constitutional right; (2) the

5    municipality had a policy; (3) this policy amounts to deliberate indifference to the

6    plaintiff's constitutional rights; and (4) the policy was the moving force behind the

7    constitutional violation."  *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474

8    (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)) (internal

9    quotation marks omitted).

10       Nevertheless, both Sgt. Jacobellis and Officer Sherf are AZPOST (Arizona Peace

11   Officer Standards and Training) certified, and Officer Sherf is a Crisis Intervention Team

12   (CIT)-trained officer, having completed his CIT training in December 2017.  (Doc. 72

13   ¶¶ 113−14.)  Prior to the events in this action, both Sgt. Jacobellis and Officer Sherf

14   completed the FPD's 8-hour Mental Health-First Aid training in August 2018 and De-

15   Escalation training in April 2018, and Sgt. Jacobellis had completed additional trainings

16   related to police officer interactions with those with mental health issues.  (*Id.* ¶¶ 115.)

17   These trainings are in addition to the mental illness training both officers received in their

18   police academy curriculum, as required to become AZPOST certified.  (*Id.* ¶ 118.)

19       The goal of FPD policy 417, "Crisis Intervention Team; Dealing with Individuals

20   with Mental Illness and Developmental Disabilities; SMART Card Program," ("CIT

21   Policy") is to reduce violence, injuries and potential litigation by providing appropriate

22   services to individuals in need of counseling, therapy, or professional mental health

23   evaluation.  (*Id.* ¶ 122.)  Under the CIT Policy, officers must "secure the scene insuring the

24   safety of witnesses, bystanders and officers and then determine if a mental health issue is

25   involved."  (*Id.* ¶ 123.)  Officers are further required to "make efforts to affect an arrest (if

26   a crime has occurred), obtain a psychiatric evaluation (voluntary or involuntary) . . . or

27   refer individuals to appropriate resources available."  (*Id.* ¶ 124.)

28

1    FPD Policy 300, Response to Resistance, provides officers guidance on the
2    reasonable use of force in response to individuals who resist.  (*Id.* ¶ 125.)  The policy
3    identifies five levels of resistance, from passive resistance, defensive resistance, active
4    aggression, and aggravated active aggression.  (Doc. 96 ¶ 126; Doc. 72-5 at 118−19.)
5    Active aggression is described as when "the subject displays the intent to harm the officer,
6    themselves, or another person and prevent an officer from placing the subject in custody
7    or taking control."  (*Id.* at 118−19.)  The policy also categorizes levels of force as low,
8    intermediate, and deadly force.  (*Id.* at 119—120.)  Head and neck strikes are considered
9    intermediate force and fall under the category "hard, empty hand techniques." (*Id.* at 120.)
10   Head and neck strikes are prohibited except in cases of active aggression/aggravated active
11   aggression.  (Doc. 96 ¶ 127.)  Nothing within FPD's policies or training requires officers
12   to abstain from arresting a person with a mental illness when there is probable cause for an
13   arrest or to abstain from using reasonable force when attacked by an individual with a
14   mental illness.  (Doc. 72 ¶ 128.)

15       FPD Officers receive training on these policies more than one time annually through
16   various types of trainings.  (Doc. 72 ¶ 129.)  Prior to the April 2019 incident in this action,
17   neither Sgt. Jacobellis nor Officer Sherf had ever been disciplined for any alleged excessive
18   uses of force or wrongful arrests.  (*Id.* ¶ 130.)

19       FPD Command Staff investigate allegations of officer misconduct when complaints
20   and internal affairs investigations are received.  (*Id.* ¶¶ 137--140.)  When an allegation of
21   wrongdoing is sustained, officers will receive some form of discipline, reprimand, remedial
22   training, and/or suspension and termination if appropriate.  (*Id.* ¶ 138.)  The Chief of Police
23   may disagree with Command Staff's recommended discipline or its finding that no
24   violation took place.  (*Id.* ¶ 139.)  Command Staff may also request additional investigation
25   in use-of-force incidents to determine whether the force was justified.  (*Id.* ¶ 140.)

26
27
28

After Brandon's arrest, Sgt. Jacobellis and Officer Sherf submitted a required use-of-force report, which was investigated by FPD Command Staff, and the force was found to be justified.  (*Id.* ¶ 141.)[9]

Defendants have met their initial burden of showing that the City did not have a policy or custom of failing to train or supervise its police officers on the proper use of force.  The evidence regarding FPD's policies shows that the City set forth standards regarding the appropriate use of force when a subject resists, and these policies do not permit or condone the excessive use of force.  The evidence also shows that all alleged excessive use-of-force incidents are investigated by FPD Command Staff, and officers receive discipline for actions deemed improper by the Command Staff or Police Chief.  Defendants have also shown that both Defendant Officers were AZPOST certified, meaning they had received mandatory police officer training in the proper of force; both officers had completed additional trainings on FPD policies more than once a year, including on the proper use of force; and neither officer had ever been disciplined for improper use of force

---

[9] Defendants provide evidence of four additional use-of-force incidents between 2017 and 2018, which Plaintiff disclosed in her Mandatory Initial Discovery Responses as supportive of her *Monell* claim against the City, each of which was an officer-involved shooting of an armed subject. (Doc. 72 ¶¶ 131-136.) Only the first three incidents involved use of force by FPD officers, and in each of these instances, the officers were cleared of wrongdoing by the FPD Use of Force Board or by the County Attorney following a criminal investigation. (*Id.*) Plaintiff does not dispute these facts or that the fourth incident concerned only the use of force by Coconino County Sheriff's deputies, not FPD officers who were called to assist, but she argues, without citing to any evidence, that for 2017 and 2018, FPD produced 134 use-of-force reports each year, and only one officer was disciplined for excessive use of force in 2017, and none were disciplined in 2018; then in 2019, FPD produced 250 use-of-force reports and only one officer was disciplined for excessive use of force. (Doc. 96 ¶¶ 130A, 138.) From these alleged facts, Plaintiff surmises that FPD's process for reviewing use-of-force incidents is "deficient, self-justifying and perfunctory." (*Id.*) These arguments are not appropriate in a statement of facts.  To the extent Plaintiff sets forth relevant arguments with proper support in her memorandum of law, the Court will address those arguments in the discussion of Plaintiff's *Monell* claim.

or false arrest. These facts demonstrate that the City did not have an official policy or custom of failing to train or supervise its police officers.

To show that the City had such a policy or custom, Plaintiff points to evidence, outside the excessive force context, that Police Chief Mussleman testified that FPD officers do not always follow certain policies, such as when to use lights and sirens, which he described as "guidelines for the officers to rely on to make the decisions in the field." (Doc. 95 at 32; Doc. 96 ¶ 119.) Plaintiff also makes speculative, unsupported claims that FPD's internal investigations are perfunctory (Doc. 96 ¶ 131B),[10] cites to conclusory statements in her Controverting Statement of Facts to argue that FPD does not adequately investigate complaints (*Id.* ¶ 138), and cites to evidence that, four days before Brandon's arrest, Sgt. Jacobellis had been disciplined for verbal complaints he made about FPD staffing and morale to a subordinate officer, not involving an arrest or the use of force. (*Id.* ¶ 131A; Doc. 110-1.) From this, Plaintiff vaguely asserts that "[t]he overall culture of the FPD indicates that supervision in general is lacking." (Doc. 95 at 32.)

Even if Plaintiff could show a constitutional violation, the unrelated evidence and unsupported arguments on which she relies are too general and conclusory to create a genuine issue of material fact that the City had either an official policy or custom of failing

---

[10] Plaintiff only specifically cites to a single, May 27, 2017 FPD "Use of Force" report showing that an officer pointed his gun at a subject, James, who refused orders to show his hands to officers and moved his hands behind his back when the officers attempted to question him at the scene of a reported fight. (Doc. 96 ¶ 131B; Doc. 99-1.) The report shows that, after the officer pointed his gun at James, another officer took James to the ground, and the officers then handcuffed, but later released James and advised him he was not under arrest; however, James was later charged with misdemeanor counts of disorderly conduct and resisting arrest. (Doc. 99-1 at 4−5.) This use-of-force incident was investigated by FPD Command Staff, and the officer who pointed his weapon at James was cleared of wrongdoing. (*Id.* at 1−3.) Without citing to particular facts, Plaintiff calls the review of this incident "perfunctory" and claims that "[a] quick review of the DR shows that the force used against James T. was excessive and that he was charged for the crime of resisting arrest, despite no probable cause." (Doc. 96 ¶ 131B.) But even if there were some showing that excessive force was used, a single incident during a three-year timeframe is not enough to show that the City had a policy or custom of failing to adequately train or supervise its police officers on the proper use of force.

to properly train or supervise its police officers.  Absent these showings, Plaintiff's *Monell* claim against the City fails as a matter of law, and the Court will dismiss this claim with prejudice.

### B.     Counts Five and Six: ADA Claims

#### 1.     ADA Legal Standard

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "public entity" is "any State or local government; [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131.  Because the ADA applies to public entities, individuals may only be sued under the ADA in their official, not their individual capacities.  *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (plaintiff cannot sue government officials in their individual capacities to vindicate rights created by Title II of the ADA).  To state an ADA claim, a plaintiff must allege facts to support that he: "(1) is a handicapped person; (2) that he is otherwise qualified [for participation in the services or programs]; and that the [defendant entities'] actions either (3) excluded his participation in or denied him the benefits of a service, program, or activity; or (4) otherwise subjected him to discrimination on the basis of his physical handicap."  *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996).

In the arrest context, courts have recognized at least two types of Title II claims:

> (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and

> (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

*Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *appeal dismissed in part and rev'd in part on other grounds in City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015).

### 2.    Discussion

#### a.    Wrongful Arrest

Plaintiff's ADA claim based on wrongful arrest arises from Defendant Officers' alleged misperception of Brandon's actions of (1) walking in the roadway and, (2) shoving Sgt. Jacobellis when confronted, as criminal activity rather than recognizing these actions as the effects of Brandon's disability.  (Doc. 13 ¶¶ 80−82.)

"To prevail on a theory of wrongful arrest under the ADA, [a plaintiff] must prove that (1) he was disabled; (2) [the defendant officer] knew or should have known he was disabled; and (3) [the defendant officer] arrested him because of legal conduct related to his disability." *Leibel v. City of Buckeye*, 364 F. Supp. 3d 1027, 1042 (D. Ariz. 2019), *aff'd sub nom. C.L. by & through Leibel v. Grossman*, 798 F. App'x 1015 (9th Cir. 2020). "[E]xigent circumstances inform the reasonableness analysis under the ADA, just as they inform the distinct reasonableness analysis under the Fourth Amendment." *Sheehan*, 743 F.3d at 1232.

As to the first two elements, Defendants do not dispute that Brandon is mentally disabled, but they argue that they did not know this at the time of Brandon's arrest because Plaintiff only told them Brandon was autistic after the fact.  (Doc. 87 at 28.)  This argument is unpersuasive.

The record contains sufficient facts, seen in a light most favorable to Plaintiff, from which a reasonable jury could infer that Defendant Officers knew Brandon was mentally disabled before his arrest.  These include that in the initial log notes that Sgt. Jacobellis read, Brandon was described as "pacing back and forth and yelling alone"; when Sgt. Jacobellis first attempted to speak to Brandon in the police station parking lot, Brandon was unresponsive and walked away; when Plaintiff explained to Sgt. Jacobellis that Brandon was her son, she stated that Brandon was "whacked" because he had been

deprived his medications; Sgt. Jacobellis radioed that Brandon was "10-16"—the police code for a mentally ill person; Defendant Officers can be seen and heard on camera laughing and commenting on Brandon's actions and mental state; and, just before the officers' encounter with Brandon in the roadway, police aide Eastin also referred to Brandon as a "10-16."  Defendant Officers did not need to know Brandon's specific diagnoses for a reasonable jury to conclude from these facts that they knew Brandon was mentally disabled and was further impaired due to being off his medications at the time of his arrest.

Plaintiff's ADA claim based on false arrest nonetheless fails on the third prong because Brandon was arrested for obstructing a roadway and aggravated assault, not for legal conduct related to his disability  Further, even though a reasonable officer could have perceived Brandon's actions as the effects of his disability for which he had no criminal intent, for the reasons already discussed with respect to Plaintiff's Fourth Amendment claims, Defendant Officers were permitted to arrest and detain Brandon based on exigent circumstances.  *See Bates*, 216 F.3d at 373 ("We need not undertake an independent ADA inquiry in this case because our Fourth Amendment scrutiny has already accounted for all the situation's circumstances").  Plaintiff's ADA claim for false arrest therefore fails as a matter of law, and the Court will dismiss this claim with prejudice.

### b.     Failure to Accommodate

Plaintiff also brings a "failure to accommodate" claim based on the same set of operative facts, alleging that Defendant Officers

> chose to escalate the situation without calling for the Crisis Intervention Team, without considering the use of civil commitment laws, without appreciating [Brandon's] fear of police, without contacting the CIT shift supervisor and without treating [Brandon] as a consumer under written departmental policy.[11]

---

[11] Plaintiff does not allege any facts regarding what accommodations Brandon was allegedly entitled to and deprived of as "a consumer under written departmental policy."

1   (Doc. 13 ¶ 74.)

2       "A public entity must 'make reasonable modifications in policies, practices, or

3   procedures when the modifications are necessary to avoid discrimination on the basis of

4   disability.'" *Wong v. Regents of Univ. of California*, 192 F.3d 807, 818 (9th Cir. 1999), *as*

5   *amended* (Nov. 19, 1999); 28 C.F.R. § 35.130(b)(7).  "[W]hen the plaintiff alleges a failure

6   to accommodate, part of the plaintiff's initial burden includes 'showing the existence of a

7   reasonable accommodation.'" *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1046

8   (9th Cir. 1999) (internal citation omitted).

9       Plaintiff fails to meet her initial burden of showing the existence of a reasonable

10  accommodation Defendant Officers could have made at the time of Brandon's arrest that

11  they failed to make.  In her Complaint, Plaintiff generally alleges that Defendants failed to

12  contact the Crisis Intervention Team or the CIT shift supervisor or to treat Brandon "as a

13  consumer under written departmental policy."  (*Id.* ¶ 74.)  To the extent Plaintiff means

14  that Defendant Officers should have contacted the CIT before attempting to interact with

15  Brandon themselves, the Court has already found that Sgt. Jacobellis's initial investigatory

16  stop of Brandon in the street was justified due to the exigency of the circumstances, which

17  are equally relevant to the ADA reasonableness analysis.  *Sheehan*, 743 F.3d at 1232.[12]

18      The Court's finding that Defendant Officers' subsequent uses of force were

19  objectively reasonable also informs the ADA's reasonable accommodation analysis.  *See,*

20  *e.g.*, *Leibel*, 364 F. Supp. 3d at 1043 ("Although C.L.'s condition may render him more

21  sensitive to physical force than others, C.L. has not identified any authority suggesting a

---

23      [12] Plaintiff argues that Defendants improperly rely on *Sheehan* because the
24  circumstances confronting the officers in *Sheehan* were more extreme than those
    confronting Defendant Officers at the time Sgt. Jacobellis stopped Brandon in the street.
25  (Doc. 95 at 33–34.)  This argument is misplaced.  *Sheehan* found that an analysis of exigent
26  circumstances is equally relevant in both the Fourth Amendment and ADA context.
    Nothing in *Sheehan* suggests that the exigent circumstances need be the same or similar to
27  those in *Sheehan* for this principle to apply, and the Court has already determined that
    exigent circumstances justified Sgt. Jacobellis's initial *Terry* stop under the Fourth
28  Amendment and that Defendant Officers' subsequent uses of force were objectively
    reasonable in relation to the need for force in this instance.

police officer must—to avoid liability under the ADA—refrain from using any force if he learns (or comes to suspect) the person he's in the process of lawfully arresting is autistic."). Inferring in Plaintiff's favor that the Crisis Intervention Team could have better responded to Brandon's needs and addressed the situation without the need for force, it is undisputed that, when he first tried to interact with Brandon, Sgt. Jacobellis did not have a reasonable opportunity to assess the situation and determine that a CIT response was required before Brandon lunged forward and abruptly shoved him. Under the totality of the circumstances confronting the officers at that time, the moderate to intermediate force Defendant Officers employed to gain immediate control of Brandon was objectively reasonable, and Plaintiff fails to show that Defendant Officers had a reasonable opportunity to call the CIT Team or Supervisor or make any other reasonable accommodations that would have dispelled the need for force to take control of Brandon at the time.

Plaintiff also fails to identify any reasonable accommodations Brandon required that Defendant Officers or the City failed to make following Brandon's arrest. Plaintiff argues, without citing to any evidence, that "after [Brandon] was in handcuffs, Plaintiff specifically asked them to accommodate his disability by having him civilly committed rather than charged and taken to jail." (Doc. 95 at 34.) The evidence shows that, at the time of Brandon's arrest, Plaintiff objected multiple times to Brandon being taken back to jail, and she insisted that he needed to go to the hospital. It is undisputed that Sgt. Jacobellis eventually complied with the request to have Brandon transported to the hospital before being taken back to jail. Brandon was then examined by Dr. Lotz, and Dr. Lotz restarted Brandon's medications, contacted the jail nurse about Brandon's medication needs, and prescribed enough medications for Brandon to take following his expected release from jail the next morning until Plaintiff could get him home. It is not clear what Plaintiff means by Defendants' failure to have Brandon "civilly committed" instead of taking him back to jail or how this would have better accommodated his mental disabilities at the time.

In short, Plaintiff fails to identify with specificity any reasonable accommodations Brandon was deprived of before or after his arrest to support her ADA claim based on failure to accommodate, and the Court will dismiss this claim with prejudice.

**V.    State Law Claims**

　　**A.    Counts Seven, Eight, and Nine: Intentional Torts**

In Counts Seven, Eight, and Nine, Plaintiff sues Defendant Officers for assault and battery and intentional infliction of emotional distress on both Brandon and Plaintiff based on the physical force Defendant Officers used on Brandon at the time of his arrest.

Defendants argue that all of Plaintiff's intentional tort claims fail under Arizona Revised Statute § 13-409, which states that

> A person is justified in threatening or using physical force against another if **in making or assisting in making an arrest or detention** . . . such person uses or threatens to use physical force and all of the following exist:
>
> 1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.
>
> 2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.
>
> 3. A reasonable person would believe the arrest or detention to be lawful.

Ariz. Rev. Stat. § 13-409 (emphasis added).

Plaintiff does not specifically address this statute, but she argues that "[w]hether a reasonable person would believe that the force used against [Brandon] was immediately necessary to effect his arrest or detention and that the arrest and detention are lawful are jury questions."  (Doc. 95 at 35.)

Plaintiff has already conceded that Brandon's arrest for aggravated assault was supported by probable cause.  Thus, Brandon's arrest and detention were lawful.  Although

1    Plaintiff baldly argues that it is a jury question whether a reasonable person would find that

2    the force Defendant Officers used was immediately necessary, the Court has already found

3    that Defendants have met their initial burden of showing that the force Defendant Officers

4    used to take control of Brandon was objectively reasonable under the circumstances.

5    Plaintiff fails to create a genuine issue of material fact that would alter this finding.  Section

6    13-409 therefore applies, and Defendant Officers are shielded from liability for their

7    alleged intentional torts arising from their use of force during Brandon's arrest.

8         In the alternative, as to Plaintiff's assault and battery claims, Arizona Revised

9    Statutes § 13-404(A) states that "a person is justified in threatening or using physical force

10   against another when and to the extent a reasonable person would believe that physical

11   force is immediately necessary to protect himself against the other's use or attempted use

12   of unlawful physical force."  Ariz. Rev. Stat. § 13-404.

13        It is undisputed that Brandon used physical force against Sgt. Jacobellis when Sgt.

14   Jacobellis tried to talk to him and tell him he could not walk in the roadway, and he

15   subsequently bit and attempted to bite Sgt. Jacobellis when Defendant Officers attempted

16   to handcuff him.  For this reason, Defendant Officers were justified in using reasonable

17   physical force to protect themselves against Brandon's "use or attempted use of unlawful

18   physical force."   Section 13-404 therefore shields them from state law liability on

19   Plaintiff's assault and battery claims, and these claims fail as a matter of law.

20        As to Plaintiff's Intentional Infliction of Emotional Distress (IIED) claims, Arizona

21   follows the Restatement (Second) of Torts § 46(1) (1965), which requires that, to prevail

22   on an IIED claim, "the conduct by the defendant must be 'extreme' and 'outrageous.'"

23   *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987).  For the reasons already discussed,

24   Plaintiff fails to create a genuine issue of material fact that Defendant Officers' conduct

25   met this standard, and her IIED claims also fail as a matter of law.

26        **B.    Count Twelve: Violation of Arizona Revised Statutes § 36-551.01**

27        In Count Twelve, Plaintiff sues Defendant Officers for a violation of the rights of a

28   person with a developmental disability under Arizona law.

1   Arizona Revised Statutes §36-551.01(A) states that

2       [a] person with a developmental disability in this state shall not
3       be denied as the result of the developmental disability the
        rights, benefits, and privileges guaranteed by the constitution
4       and laws of the United States and the constitution and laws of
        this state.   The rights of persons with developmental
5       disabilities which are specifically enumerated in this chapter
        are in addition to all other rights enjoyed by such persons.  The
6       listing of rights is not exclusive or intended to limit in any way
7       rights which are guaranteed to persons with developmental
        disabilities under state and federal laws.

8

9   Ariz. Rev. Stat. § 36-551.01(A).

10      Plaintiff generally alleges that Defendant Officers violated this statute because they

11  "intentionally, knowingly, recklessly or negligently subjected [Brandon] to abuse and

12  violated [Brandon's] rights guaranteed by Arizona statute." (Doc 13 ¶ 96.)  Plaintiff does

13  not specifically allege any violations of this statute apart from those alleged in her other

14  Counts, for which the Court has already found she fails to create a genuine issue of material

15  fact.   Moreover, the statute goes on to state that "[a]ny person with a developmental

16  disability or the parent or guardian of a person with a developmental disability who

17  believes that his rights . . . have been violated has a right to petition the superior court for

18  redress **unless other remedies exist under federal or state laws**." Ariz. Rev. Stat. § 36-

19  551.01(S) (emphasis added).  Plaintiff has not alleged any violations under § 36-551.01

20  that are not already encompassed by her other claims in this action as to which other

21  remedies exist under federal or state laws.

22      Plaintiff rightly notes in her Response that claims under the ADA do not provide

23  remedies against individual actors but only against government entities.  (Doc. 95 at 37.)

24  From this, she argues that she has no other remedy against Defendant Officers for claims

25  of discriminatory treatment and therefore can sue them for alleged discrimination under

26  § 36-551.01.  (*Id.*)  Plaintiff is mistaken.  That Defendant Officers cannot be held liable in

27  their individual capacities under the ADA is immaterial here, where the Court has already

28

found that, regardless of who is the defendant, Plaintiff's ADA claims for false arrest and failure to accommodate fail as a matter of law.

## VI.    Remaining Motions

Defendants' two *Daubert* Motions (Docs. 78, 79), and Plaintiff's Motions to Strike those Motions (Docs. 80, 81) pertain to witnesses Plaintiff purportedly intended to call at trial in support of her claims.  Defendants object to Plaintiff's intended reliance on these witnesses on several grounds, including failure to timely disclose and failure to follow the applicable Federal Rules for disclosing and utilizing these experts.  Plaintiff's Motions to Strike argue, in part, that these Motions are premature and should be stricken until the Motion for Summary Judgment is resolved.

In her Response to Defendants' Motion for Summary Judgment, Plaintiff did not cite to any expert opinions to support the merits of her claims, and the Court therefore did not rely on any such opinions or reports.  Because the Court will dismiss Plaintiff's claims and terminate this action, it will deny as moot the *Daubert* Motions and Motions to Strike.[13]

**IT IS HEREBY ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motions to Exclude (Docs. 68, 69), Plaintiff's Motions to Strike (Docs. 80, 81), and Defendants' Motion for Summary Judgment (Doc. 87).

(2)    Defendants' Motion for Summary Judgment (Doc. 87) is **granted**, and this action is **dismissed with prejudice**.

(3)    Defendants' Motions to Exclude (Docs. 68, 69) and Plaintiff's Motions to Strike (Docs. 80, 81) are **denied as moot**.

. . .

. . .

---

[13] Defendants' request for an award of attorneys' fees in their Motion for Summary Judgment (Doc. 87 at 34) is improper and will be denied pending submission of a properly supported Motion for Attorneys' Fees within 14 days of entry of final judgment.  *See* LRCiv. § 54.2(b).

(4)     This action is **terminated**; the Clerk of Court must enter judgment accordingly.

Dated this 6th day of June, 2022.

_____

G. Murray Snow
Chief United States District Judge